In the Matter of the Application of THE DIAMOND STATE TELEPHONE COMPANY for Changes in Rates in Accordance with Section 151 of Title 26 of the *Delaware Code of* 1953.

(*March* 17, 1959.)

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, J. J., sitting.

*H. James Conaway, Jr.* (of Morford, Young and Conaway), and *Richard W. Case* and *Edward O. Clarke, Jr.* (of Clark, Smith and Prendergast, of Baltimore, Md.), for the Commission.

*William S. Potter, Richard F. Corroon* and *James L. Latchum* (of Berl, Potter and Anderson), and *John B. King* and *Peter F. Pugliese* (of Philadelphia, Pa.), for the Company.

Supreme Court of the State of Delaware, No. 49, 1958.

SOUTHERLAND, C. J.:

Diamond State Telephone Company furnishes telephone service within the State of Delaware. It applied to the Public Service Commission for an increase in rates. After hearings the Commission made findings of fact and on January 15, 1958 entered an order based thereon. The Company appealed to the Superior Court and sought revision of the order in four respects. That court sustained the Company, and entered an order revising the Commission's order in those respects. Three of the four questions had already been decided by the Superior Court in a prior appeal, hereinafter referred to.

The Commission appeals.

1. Working Capital

The Commission disallowed working capital as an element of the rate base. The Superior Court restored it, naturally feeling bound by the prior opinion of that court in *Application of Diamond State Telephone Company*, 1954, 9 *Terry* (48 *Del.*) 317, 103 *A.* 2d 304, 320. In that case it appeared that the Commission

had disallowed working capital on the ground that there was no necessity for it, since the Company had in hand funds from sources other than investors sufficient to provide the required working capital. The Superior Court held (1) that it was within the discretion of the Board of Directors to determine whether to keep on hand a reasonable amount of working capital; (2) that in any event there was no competent evidence before the Commission justifying its finding. On appeal to this Court the decision of the Superior Court was affirmed on the second ground. 9 *Terry* 497, 107 *A.* 2d 786, 789. In the instant case the Commission had before it competent evidence of the pertinent facts. The question before us therefore is whether those facts justify the elimination of working capital as an element of the rate base—a question not heretofore decided by this Court.

In rejecting the Company's request for an allowance of $150,000 for working capital, the Commission adopted the so-called "alternative fund" theory. This theory, as stated by the Commission's witness, is that if the Company's customers provide the cash necessary for the daily operation of the business, it would be unfair to require the rate-payers to pay a return on their own funds. In support of this theory, the Commission found that the Company on January 1, 1957 (the middle point of the test year) had cash on hand equal to $243,359, but had also at that time collected cash from its customers in the amount of $566,125. The Commission also found that the Company's books showed a liability of $1,993,822 accrued for taxes (largely federal income taxes, we are informed).

Based upon these three items in the balance sheet, the Commission found that there was no need to allow an item of working capital as part of the rate base.

Before we analyze these items a statement of principles is in order. "Working capital * * * is an allowance for the sum which the company *needs to supply from its own funds* for the purpose of enabling it to meet its current obligations as they arise and to operate economically and efficiently." Barnes, *Eco-*

*nomics of Public Utility Regulation* (1947), p. 495. "[T]he need for working capital arises largely from the time lag between payment by the Company of its expenses and receipt by the Company of payments for service in respect of which the expenses were incurred." *Alabama-Tennessee Natural Gas Co. v. Federal Power Commission,* 3 *Cir.,* 203 *F.* 2d 494, 498. This factor of the "time lag" is, we think, the important consideration. To the extent that payments for the Company's services are actually made before it is required to pay its own obligations, they form a fund which, to some extent at least, dispenses with the need for the investors to supply working capital. This "alternative fund" theory is of recent development. See 52 *Columbia Law Review,* p. 656. Its rationale appears to be that working capital is always necessary; but the extent to which it is allowable as an element of the rate base depends upon the facts respecting the Company's cash receipts.

We turn now to the three balance sheet items relied on by the Commission to eliminate the necessity of working capital.

■ The first is Account No. 160, Customers' Deposits, amounting to $166,145. These are funds deposited by customers against payment for future service in cases when credit has not been established or is doubtful. Since the Company pays six per cent interest on these deposits, it is in effect borrowing the money, and we fail to see how this cash can be distinguished for the present purpose from other cash raised by borrowing. We do not think that it is a proper off-set against working capital.

■ The second item is Account No. 164, Advanced Billings and Payments, in the amount of $399,980. It was shown that of this amount only $1,500 represented cash actually collected, and that there was about a twenty-five day time lag between the rendition of service and the payment of bills. These facts the Commission evidently deemed immaterial, adopting the theory that the total amount had been accrued on the books. But we are dealing here with cash to be used as working capital—not with accounts payable. There was no showing of an offsetting time lag

in the payment of the Company's bills. The Commission in its brief takes the position that the Company should have supplied this evidence, but we think that after the company had submitted the evidence above referred to, counsel for the Commission was called upon to rebut it.

We cannot agree that the item of Advance Billings (with the trifling exception noted) should be deemed an off-set against working capital.

But the third item—accrued taxes of nearly $2,000,000 —presents a different question. Rates are set with due regard to the heavy federal income tax; that is, the tax is passed on to the rate-payer. There is an important time lag between the collection of the tax and its payment. The reserve for income taxes accumulates during the calendar year. Moreover, there is a further lag arising from the fact that the tax may be paid in instalments, thus permitting the Company to retain substantial amounts of cash during periods when additional tax reserves continue to be built up. It would appear that the Company always has, throughout a year, a substantial amount of cash derived from this source. If the amount of such cash never falls below $150,000, no need appears for the Company's investors to supply working capital. If that is the fact, the Commission's ruling should stand. We cannot determine the fact from this record, since no effort was made to establish it. It does not appear what period of time constitutes the Company's fiscal year, nor does it appear at what times the Company pays the tax, nor the amount of such payments. On remand to the Commission, these facts can no doubt be readily supplied.

Of course, if at one or more times during the year the Company has paid out all the tax reserve, thus leaving it with no balance from this source available for working capital, the matter will have to be considered further. But since this result seems highly unlikely, we think it sufficient to remand the case with instructions to find the necessary additional facts above referred to.

We realize that this conclusion represents a departure from the traditional method of including working capital in the rate base. See 52 *Columbia Law Review*, p. 656. But it has been approved in recent years by high authority. See for example, *Alabama-Tennessee Natural Gas Co. v. Federal Power Commission, supra; City of Cincinnati v. Public Utilities Commission,* 1954, 161 *Ohio St.* 395, 119 *N. E.* 2d 619; *Chesapeake and Potomac Telephone Co. v. Public Service Commission,* 1952, 201 *Md.* 170, 93 *A.* 2d 249; *City of Pittsburgh v. Pennsylvania Public Utilities Commission,* 1952, 370 *Pa.* 305, 88 *A.* 2d 59. See also *Public Utility Accounting,* Foster and Rodey, (1951), p. 101.

This phase of the case will be remanded to the Commission for further findings, and for such further proceedings as may be necessary, if any.

2. Adjustment in the Company's Income Tax.

This is the second attempt by the Commission to "adjust", *i.e.*, arbitrarily reduce for rate-making purposes, the amount of federal income taxes paid by the Company and deducted as an operating expense. The argument back of the adjustment runs as follows:

The Company, one of the units of the Bell System, participates in a consolidated income tax return filed by the parent corporation; it pays as its share of the total tax the amount it would pay if it filed a separate return; the Company has a funded debt ratio of only seven per cent, in contrast to the "average debt ratio" of the Bell System of 34.5 per cent; the result is that it pays more income tax than it would if it had a larger funded debt, or the average funded debt; if it paid less tax, its net earnings would be increased and the rates to customers could be correspondingly reduced; since the Company is a unit of the Bell System, its funded debt should be taken to be the average debt of all the companies in the System, and its income tax, as a deduction from operating expenses, reduced accordingly.

The effect of this ruling is obvious. An actual expense incurred by the Company is disallowed by assuming a tax saving that does not exist. How can such an arbitrary ruling be defended? The Commission insists that this action is only a "pragmatic adjustment" of a capital structure that is "totally unrealistic". By this is apparently meant that a utility company *ought* to have a substantial amount of long-term debt, instead of relying on financing by its parent corporation in the form of temporary loans later converted into stock.

The simple answer to this contention is that the Commission cannot arbitrarily disallow actual expenses on the theory of reforming the Company's capital structure. We say "arbitrarily" because there is nothing in this record on the basis of which the Commission could have found that the parent corporation has abused its control or has been guilty of any wrongdoing adversely affecting the Company's subscribers.

If it be said that the Company is forced by its management to pay more for its capital than is fair, because the cost of equity capital is greater than the cost of debt capital, the answer is that the Commission has already taken this fact into account in fixing the rate of return. For that purpose it assumed debt capital of 35%.

The Commission appears to argue that because it is proper in fixing a fair rate of return to use a hypothetical debt ratio, it is also proper to use it to disallow tax expense actually incurred.

This does not follow. The fixation of a fair return, like the determination of fair value, requires the consideration of a large number of factors, the making of many assumptions, and an overall exercise of judgment. The allowance of legitimate expenses presents no such problem.

In effect the Commission is here attempting to do indirectly that which it could not do directly under its statutory powers— control the fiscal policies of the Company by penalizing it for adherence to those policies.

This question was presented to the Superior Court in 1954 and disapproved. 9 *Terry* 317, 103 *A.* 2d 304, 323, 324. Judge Layton commented:

"I know of nothing more exclusively within the sound discretion of corporate directors than the exercise of judgment concerning its financial affairs. * * * If this Commission's decision were upheld in this respect, the Corporation might feel compelled against its judgment to increase its debt limit in order to gain actual, rather than fictitious advantage, of the tax deductions so thrust upon it. Obviously, this places the Commission in a position indirectly to influence important decisions of the directors."

We agree with these comments. See also *Public Service Commission v. Indiana Bell Telephone Co.*, 235 *Ind.* 1, 130 *N. E.* 2d 467, 480.

We approve the holdings of the Superior Court on this question.

### 3.   Interest on Plant under Construction.

Under the Uniform System of Accounts funds invested by the Company in current construction are placed in a special account. When the construction is completed these amounts are transferred to another account. The amount of plant under construction as of December 31, 1956 (the mid-point of the test year), is included in the rate base, so that the Company is permitted to earn a return on the investment although it is not income-producing. Five per cent of that amount is credited to the Company's income as "interest on Plant under Construction". This is a book entry, only, designed to avoid a duplication of earnings.

The amount included in the rate base, calculated on an intrastate basis, was $390,805. The Company urged that in computing revenues only five per cent on that amount should be included as interest on plant under construction. The Commission ruled that *all* interest on plant under construction accrued

from time to time during the entire test year (calculated on an intrastate basis) should be credited to revenue. The Superior Court reversed, holding the Company's position to be correct.

We agree with the Superior Court. If the Company's revenues are to be credited with *all* interest during the test year, then the entire year should have been taken into consideration in determining the amount of plant under construction. The amount of interest to be credited to revenues should be five per cent of the amount of plant construction included in the rate base. The Commission's method was manifestly one-sided, and hence unfair.

The Commission makes two arguments in support of its ruling.

First, it is said that the total of interest under construction credited during the year should be included because this item is no different in principle from revenues received by the Company for its exchange services.

The fallacy of this argument is manifest. Interest under construction is not "revenue" in a real sense; it does not, like exchange revenue, represent money received by the Company. As above stated, it is a mere book entry—an accounting device to avoid duplication of earnings on the amounts invested in plant under construction. It is therefore directly related to the amount of plant under construction included in the rate base.

Second, it is urged that the decision of the Commission on the matter here involved was peculiarly one within its discretion and should not be disturbed, because its solution requires the application of purely accounting principles. This argument is reiterated at length in the last division of the Commission's brief. It is said that accounting questions are questions of fact, and the Commission's determination of such questions should not be disturbed unless capricious or against the clear weight of the evidence. No doubt in some cases this rule would apply, but to the point here involved it does not apply. The question

is one of basic fairness or unfairness in the use of accounting methods. There is no disputed question of fact.

The suggestion that because the point *involves* accounting it should be left to the Commission would, if approved, certainly have the advantage of relieving the courts from the necessity of grappling with many questions in these rate cases. Without doubt there has been a tendency in recent years for the courts to sustain the findings of administrative bodies if it is possible to do so, whether accounting or some other field of "expertise" is involved. Possibly this is desirable; certainly, as above noted, it is a way of relieving the courts from the consideration of some difficult questions. But there is something to be said upon the other side of the matter. The Public Service Commission performs primarily a legislative function. It is here in our Court as a litigant, not as a judicial tribunal. "The presumption in favor of the acts of a judicial or quasi judicial tribunal does not apply with the same force to a legislative tribunal, nor to a tribunal which possesses not only to some extent the powers of a court, but also to some extent the powers of a public prosecutor." *Public Service Gas Co. v. Board of Public Utilities Com'rs*, 84 *N. J. L.* 463, 87 *A.* 651, 653, *L. R. A.* 1918A, 421, quoted with approval by the Supreme Court of New Jersey in *Petition of Public Coordinated Transport*, 5 *N. J.* 196, 74 *A.* 2d 580, 590. The General Assembly has committed to the courts broad powers of review of the decisions of the Commission (26 *Del. C.* § 192). The courts are required, we think, to examine the evidence before the Commission and the reasoning on which its findings are based. *Cf. Petition of Public Consolidated Transport, supra.* This is not to say that the reviewing court will not give considerable weight to the Commission's findings, especially on disputed factual questions. But the statutory right of the utility to review by the courts must be safeguarded.

In the light of these principles we do not think that the Commission's findings and opinion were treated by the Superior Court with less than proper dignity, as its counsel suggests.

The ruling of the Superior Court on this point is affirmed.

### 4. Charitable Contributions.

The Commission disallowed as an operating expense the item of $4,656 representing charitable contributions to the Red Cross and the Community Chest. This was upon the theory that if it were allowed the rate payer would be forced to make a contribution to the Company's gifts.

This point has before been presented to the Superior Court and to this Court. In *Application of Diamond State Telephone Co.*, 9 *Terry* 317, 103 *A.* 2d 304, the Company appealed against a ruling of the Commission disallowing $3,653 (.001 of total expenses) of charitable contributions. Judge Layton sustained the appeal, holding that these small contributions were not only within the discretion of the Directors, but that they were obviously in the interest of community good will, and hence conferred some benefit upon the corporation. On appeal the judgment was affirmed on the ground that the amount of contributions was so small that it could not affect the rate schedule. 9 *Terry* 497, 107 *A.* 2d 786, 788.

In this case the contributions were made to the same two recipients, in the sum of $4,656, being 34/1000 of one per cent of total expenses.

Obviously this case is ruled by the prior one. The effect on the rate base is negligible. But the Commission insists that as a matter of law the items are not allowable expenses for rate-making purposes.

The decisions on the point are not uniform. We think that the rule announced by the Superior Court in the former rate case (9 *Terry* 317, 103 *A.* 2d 304) is the correct one. Modest contributions to important local charities, made to preserve community good will, will be allowed as a proper deduction from operating expenses. We agree that the Commission might well disallow them if the contributions were unreasonably large, or if

they were not related to the fostering of the good will of the Company in the locality in which it operates.

Since the contributions here are clearly within these limits they will be allowed, and the Superior Court's ruling will be affirmed.

It follows that the order of the Superior Court of August 18, 1958, will be affirmed, except as to paragraphs (a) and (b) thereof, relating to working capital.

The cause is remanded to the Superior Court of New Castle County, with instructions to vacate paragraphs (a) and (b) of that order, and to remand the case to the Public Service Commission with instructions to take further proceedings in accordance with this opinion.