404 A.2d 799.

JULIUS C. MICHAELSON, *Attorney General et al. vs.*
NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY.

NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY *vs.*
PUBLIC UTILITIES COMMISSION.

JUNE 29, 1979.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

724

KELLEHER, J.   On November 5, 1976, the England Telephone and Telegraph Company (the company or New England) filed with the Public Utilities Commission (the commission) a revised schedule of tariffs designed to increase the company's annual revenues from its intrastate operations by approximately $25 million. The commission, pursuant to its authority under G.L. 1956 (1977 Reenactment) §39-3-11, suspended the proposed effective date of the tariffs by separate orders dated November 11, 1976, and June 3, 1977, so

that it might conduct investigations and public hearings with respect to the propriety of the proposed increase.

On June 1, 1977, the commission conducted the first of twenty-four hearing sessions, sessions that continued through August 15, 1977. During the course of those hearings, members of the general public were given an opportunity to be heard,[1] as were, of course, the numerous expert witnesses of both the parties and the intervenors. The report and order reveals that the actual parties in the proceeding before the commission, namely, the company and the Division of Public Utilities and Carriers (the division) presented between them thirteen "technical witnesses"; eleven appeared on behalf of the company and two on behalf of the division. The commision also heard testimony from two additional expert witnesses, one each on behalf of the intervenors, the Coalition for Consumer Justice and the State of Rhode Island, Department of Administration, Division of the Budget.[2]

On September 4, 1977, the commission issued its report and order in this proceeding, rejecting the proposed filing and authorizing the company to file revised tariffs designed to produce approximately $3,422,000 in additional annual revenues.[3] After issuance of the commission's order, the

---

[1]The report and order of the commission reveals that 103 witnesses gave testimony during the public segment of the hearings. In addition, the commission received statements concerning the advisability of the rate increase "from members of the General Assembly, Municipal Finance Directors and other municipal officials, representatives of labor unions, consumer groups and interested ratepayers."

[2]The final intervenor, International Business Telephones, Inc., a competitor of the company, presented no witnesses.

[3]In its report and order, the commission was unclear with regard to the amount of additional annual revenues that it had authorized the company to collect. Twice in the course of making its findings the commission stated that the allowance was to be $3,422,000. Nonetheless, the bottom line of the commission's actual tabulations reads "[t]otal [a]llowed [i]ncrease – $3,582,000." We must for reasons discussed below remand this case to the commission for reconsideration of certain particulars, and direct that the commission at that time clarify and, if necessary, correct its position with regard to the above figure as well.

An additional matter concerning the commission's calculations requires some

company, as well as the division, together with the Attorney General (on behalf of the public and the State of Rhode Island as a consumer of the company's services) commenced in this court separate certiorari proceedings pursuant to the provisions of §39-5-1; we consolidated the petitions in this proceeding, and, pending argument, denied the Attorney General's motion to stay and suspend execution of the commision's order.

The consolidated petitions together raise several issues, involving three major areas of dispute: first, the propriety of certain accounting adjustments; second, both the sufficiency of the rate of return allowed the company on its intrastate investment and the appropriateness of an erosion adjustment granted to help ensure that inflationary trends in the economy do not undermine the company's ability to earn the rate of return actually allowed it; and finally, whether the commission has approved and has the authority to approve a tariff filing that is not based upon considerations of the cost of the service furnished to customers. We have chosen to deal with the various contentions of the parties by subject matter, as outlined above, rather than to separate the issues by dealing first with those raised in one of the two petitions and only then dealing with the issues presented in the other.

## ACCOUNTING ADJUSTMENTS

### I. *Cash Working Capital*

The company's intrastate rate base, to which the commission applies a rate of return deemed by it sufficient to allow the company to attract investment capital as well as to main-

---

explanation. The company had, as we have explained, requested that it be allowed to collect approximately $25 million in additional annual revenues. Included as part of that request, however, was $8,984,000 that we had upon review of the commission's actions in an earlier filing directed that the company be allowed to collect under bond. *New England Tel. & Tel. Co.* v. *Pub. Util. Comm'n*, 118 R.I. 570, 376 A.2d 1036 (1977); *see* G.L. 1956 (1977 Reenactment) §39-5-4. The company ignored the availability of the nearly $9 million when it made its filing in the present case, a proper offset to the $25 million increase sought. The commission issued an order on September 4, 1977, making permanent the $8,984,000 increase and therefore that sum is in fact available to the company.

tain its credit, often includes an allowance for working capital. Cash working capital has long been accepted to represent the amount of cash required to operate a utility during the interim (the "lag") between the rendition of service and the receipt of payment therefor. *Rhode Island Consumers' Council* v. *Smith,* 111 R.I. 271, 288-89, 302 A.2d 757, 768 (1973).[4]

Working capital determinations made in the course of rate proceedings have frequently been the subject of review by this court. We have said that an allowance in rate base for working capital is not something to which a utility is entitled as a matter of right. *Narragansett Electric Co.* v. *Harsch,* 117 R.I. 395, 408, 368 A.2d 1194, 1202-03 (1977); *Rhode Island Consumers' Council* v. *Smith,* 113 R.I. 384, 401, 322 A.2d 17, 26 (1974). Rather, determination of an allowance is a question of fact to be decided by the commission on the basis of the specific facts of the case before it. *New England Telephone & Telegraph Co.* v. *Public Utilities Commission,* 116 R.I. 356, 385, 358 A.2d 1, 18-19 (1976); *Rhode Island Consumers' Council* v. *Smith,* 113 R.I. at 401, 322 A.2d at 26. Because the role of factfinder is that of the commission alone, *see* §39-5-3, we review only to determine whether the commission's decision is "fairly and substantially supported by legal evidence and sufficiently specific to enable us to ascertain if the facts upon which [it is] premised afford a reasonable basis for the result reached." *Rhode Island Consumers' Council* v. *Smith,* 111 R.I. 271, 277, 302 A.2d 757, 762 (1973). In this case our concern with working capital lies in three areas: gross receipts tax expense, accrued interest expense, and average cash allowance.

---

[4]A "lag study" is the means employed by experts to determine the overall lag referred to above. The study is designed to measure the ultimate effect of individual "leads," which occur when the company collects revenues *before* it must make the payments associated with those revenues, and lags in order to determine the amount of cash working capital that the company needs in order to run its affairs on a day-to-day basis. *See Providence Gas Co.* v. *Burman,* 119 R.I. 78, 88, 376 A.2d 687, 693 (1977).

## A. *Gross Receipts Tax*

A recurrent area of dispute between the company and the division in recent years has involved the treatment of the Rhode Island gross receipts tax for purposes of working capital analysis. Specifically, the commission has examined the question whether the tax is and ought to be treated as a current one for ratemaking purposes or whether, as the company has argued, it is in fact a prepaid tax. The effect of what the company sees as a prepayment is to create a very substantial lag — a prolonged period during which the company claims that investors are entitled to a return on money "temporarily len[t] to the company" by them in order to meet the tax expense. *See Providence Gas Co.* v. *Burman,* 119 R.I. 78, 87 n.4, 376 A.2d 687, 693 n.4 (1977).

In the company's two most recent general tariff filings, including that presently under consideration, the commission has quite clearly opted to treat what it believes is a tax "paid currently" as a current tax. We approved the logic of this position in *New England Telephone & Telegraph Co.* v. *Public Utilities Commission,* 118 R.I. 570, 592, 376 A.2d 1041, 1051-52 (1977), where we upheld the commission's factual determination that the effect of a gross receipts tax paid both currently and on the basis of current revenue levels is such as to require no working capital allowance. We consequently upheld as well the commission's decision to account for any actual discrepancy between the level of test-year revenues and the level of corresponding gross receipts tax expense solely by means of an expense adjustment — the ultimate cost of state tax adjustment — used for this purpose by the company itself. *Id.* at 1052.

In this proceeding the company apparently does not dispute the testimony of division witness Aarne Hartikka (Hartikka) — testimony incorporated by the commission into its report and order — that "[t]he effect of [the ultimate cost of state tax] adjustment is to build into the Company's revenue requirement the actual tax relating to current year's revenues * * *." Rather, it contends that the expense adjustment is alone insufficient to account for the claimed lag

and that a working capital allowance is, therefore, necessary. Despite protests to the contrary by the company, we feel that its argument in this proceeding is precisely the same as that urged unsuccessfully by it in *New England Telephone & Telegraph Co. v. Public Utilities Commission,* 118 R.I. 570, 376 A.2d 1041 (1977). For the following reasons we uphold the commission's finding that "the only adjustment which can be properly made is the ultimate cost of state tax adjustment * * *."

In *New England Telephone & Telegraph Co. v. Public Utilities Commission,* 118 R.I. at 591, 376 A.2d at 1051, we explained as follows (and in somewhat simplified form) the operation of the gross receipts tax:

> "Initially, the tax was payable in full on March 1 of each year, based on the gross receipts of the utility company for the prior year. In 1968 the payments were accelerated by chapter 26 of title 44. After 1968, the tax formerly due on the first day of March in year two was thereafter to be paid during year one; i.e., the tax was paid in the same year as the receipts upon which it was based were received."

Certainly, the company could not claim a return on amounts expended to pay a current tax. *Id.* at 1052. The actions of the commission, both in this general filing and in the last such filing, reveal its position that the tax operates essentialy as a current tax. That being the case, the company's accounting procedures alone cannot bind the commission in its treatment of expense items for ratemaking purposes. *Providence Gas Co. v. Burman,* 119 R.I. 78, 87, 376 A.2d 687, 699 (1977); *New England Telephone & Telegraph Co. v. Public Utilities Commission,* 116 R.I. 356, 386, 358 A.2d 1, 19 (1976).

An examination of the theory urged by the company reveals ample justification for the commission's having rejected it. The company's reasoning on this issue has been that the gross receipts tax as it was originally promulgated was an expense of year two, the year in which it was paid in

full, rather than of year one, the year in which the receipts upon which it was based were collected. Consequently, when the tax was accelerated in 1968, it became a prepayment — a payment in year one of the taxes "due" in year two. *New England Telephone & Telegraph Co.* v. *Public Utilities Commission*, 118 R.I. 570, 591, 376 A.2d 1041, 1051 (1977). The company's conclusion is therefore that the money to pay the tax is provided by investors. Neither the division nor the commission itself contests the fact that the company treats the tax as a prepayment. Indeed, the commission makes much of the fact that "New England, alone among utilities in Rhode Island, accounts for the [expense] by charging it to income in the subsequent year." However, the commission obviously looked behind the prepayment label as applied to the gross receipts tax expense. We have as a rule refused to interfere with the commission's methodology as long as the end result is fair and reasonable. *New England Telephone & Telegraph Co.* v. *Public Utilities Commission*, 116 R.I. 356, 386, 358 A.2d 1, 19 (1976); *Narragansett Electric Co.* v. *Kennelly*, 88 R.I. 56, 71-72, 143 A.2d 709, 718-19 (1958). *See FPC* v. *Hope Natural Gas Co.*, 320 U.S. 591, 602, 64 S. Ct. 281, 287-88, 88 L. Ed. 333, 345 (1944). The company has failed to convince us that the commission acted unfairly or unreasonably in determining that the company's gross receipts tax expense is wholly and properly accounted for by use of the ultimate cost of state tax adjustment.[5]

---

[5]The company argues vehemently, as it did in *New England Tel. & Tel. Co.* v. *Pub. Util. Comm'n*, 118 R.I. 570, 376 A.2d 1041 (1977), that the commission should re-adopt an approach assertedly taken by it in 1973, when it considered the effect of the "accelerated" gross receipts tax. The company's position is that the commission at that time recognized a need for a working capital allowance in addition to use of the ultimate cost of state tax adjustment and that at least the logic, if not the precedent, of that prior determination should be controlling in this proceeding. Even assuming that the commission has in fact altered its position on this issue, we have long held that the commission is not bound by either a factual determination reached or a method utilized in an earlier docket. *E.G., New England Tel. & Tel. Co.* v. *Pub. Util. Comm'n*, 118 R.I. at 592, n.9, 376 A.2d at 1052 n.9; *Narragansett Elec. Co.* v. *Kennelly*, 88 R.I. 56, 72-73, 143 A.2d 709, 719 (1958).

## B. *Accrued Interest*

The company contends that the commission erroneously adopted Hartikka's proposal that the company's working capital requirement be reduced to reflect the availability of approximately $822,000 in accrued interest on long-term debt. It was Hartikka's position that the company pays interest on its long-term debt at 6-month intervals in arrears and that the resulting substantial delay before payment of the expense should not be ignored for ratemaking purposes.

The commission explicitly adopted Hartikka's position that the availability of funds ought to control the consideration whether to include accrued interest expense as a source of the company's working capital. It incorporated with approval Hartikka's statement that "[w]hat matters is not who supplies the funds, but rather the relationship between cash flows inward and cash flows outward." Indeed, in rejecting the company's argument that it should earn a return on accrued interest because it is investor-supplied capital, the commission said only that "[a]ll of the Rhode Island decisions on this point have recognized the critical issue to be the *availablilty* of funds, not their *source.*"

Unfortunately, the commission has misconceived the thrust of our prior decision. Although funds must, of course, be available for use before they can operate to reduce the company's working capital requirement, *e.g., Public Service Commission* v. *Continental Telephone Co.*, 94 Nev. 345, 350, 580 P.2d 467, 470 (1978), we have long accepted the traditional definition of rate base as including working capital supplied by investors but not funds supplied by consumers. *See Providence Gas Co.* v. *Burman*, 119 R.I. 78, 87 n.4, 376 A.2d 687, 693 n.4 (1977); *Rhode Island Consumers' Council* v. *Smith*, 113 R.I. 384, 394, 322 A.2d 17, 23 (1974). Indeed, in *Rhode Island Consumers' Council* v. *Smith, supra,* we upheld on the facts the commission's decision to *exclude* this very item — accrued interest expense — as a source of the company's working capital.

Although the commission has broad discretion in making adjustments to test-year data, *Narragansett Electric Co.* v.

*Harsch,* 117 R.I. 395, 417, 368 A.2d 1194, 1207 (1977), it is not free to ignore a rule of law applicable to the matter before it. *New England Telephone & Telegraph Co.* v. *Public Utilities Commission,* 116 R.I. 356, 379, 358 A.2d 1, 16 (1976). In this case the law is found in our definition of those general types of funds that are includable as part of the company's working capital requirement. While we might normally remand an issue of this kind to the commission for further consideraion, we feel that such a course is unnecessary in this proceeding in light of the fact that the commission questioned only whether the source of the funds was to have legal significance. For that reason we remand with the direction that the commission exclude the disputed amount as a source of working capital.

## C. *Average Cash*

When the company submitted its request for a working capital allowance, it included an adjustment designed to ensure the availability of what it labels "average cash." The term "average cash" has been defined for us by the company as "the relatively modest cash required to provide for day-to-day contingencies." That modest amount adds $515,819 to the company's working capital requirement and thus to its rate base, upon which it earns a return.

So far as we can tell, the only meaningful reference to the problems of average cash is contained in the company's response to a commission data request, the key to which is the company's assertion that "[t]here is, of course, in any business the need to maintain cash balances."[6] The commission, over the division's objection, granted the company's request for an allowance, stating only that

---

[6]The remainder of the company's response reads as follows:

"Our cash balances are relatively small in comparison to many firm[s'] since we use short term loans as a daily source of cash to meet large payments * * *. We do not accumulate cash in our accounts in preparation for these disbursements. Our cash average, which is minimal, represents two components; 1) employee working funds which are required in day-to-day transactions, and 2) amounts deposited to redeem drafts presented for collection."

"[i]n the absence of record evidence, we are unable to make a factual determination as to the reasonableness of excluding average cash. We decline to do so in the absence of * * * testimonial supoprt."

The Legislature has place upon the public utility — not upon the division — the burden to prove the necessity and reasonableness of proposed rate hikes. General Laws 1956 (1977 Reenactment) §39-3-12. The commission's brief comments leave us uncertain whether the commission was in fact shifting the burden of proof or whether it reached its decision because it was for specific reasons satisfied with the company's position and because of an absence of contradictory evidence from the division. We remand in order to give the commission an opportunity to clarify this portion of its report and order.

## II. *Revenues and Expenses*

### A. *Directory Advertising Rate Increases*

The company charges that the commission erroneously accepted Hartikka's recommendation that test-year earnings should be adjusted upward to recognize the effect of post-test-year changes in directory advertising revenues and expenses. Specifically, Hartikka proposed to recognize additional revenues of $502,000, which produced an overall increase in test-year earnings of $177,000. The company's response was essentially that the expenses associated with those revenues were so speculative that the commission should have disregarded this new revenue.

The task of the commission is to base future rates upon known past and present conditions through the use of data generated during a specific test period. *Narragansett Electric Co.* v. *Harsch,* 117 R.I. 395, 416, 368 A.2d 1194, 1206 (1977); *Rhode Island Consumers' Council* v. *Smith,* 111 R.I. 271, 278, 302 A.2d 757, 763 (1973). However, in order to ensure that the test year is representative of the conditions that will prevail when the new rates take effect, *Rhode Island Consumers' Council* v. *Smith,* 113 R.I. 384, 397, 322 A.2d 17, 24 (1974), the commission has both the authority

and responsibility to undertake "a reasoned exercise of its discretion in altering test-year data to reflect changes of known magnitude occurring subsequent to the test year." *Northwestern Bell Telephone Co.* v. *State*, 253 N.W.2d 815, 822 (Minnesota, 1977). Yet, despite the broad discretion it possesses in this area, the commission generally considers only post-test-year revenue and expense changes that affect test-year results with "certainty." *Rhode Island Consumers' Council* v. *Smith*, 113 R.I. 384, 393, 322 A.2d 17, 22 (1974). *See also Narragansett Electric Co.* v. *Harsch*, 117 R.I. at 416-17, 368 A.2d at 1206-07. To factor in changes of unknown magnitude would in most cases increase what speculation already exists in the rate-making process and thereby tend to undermine the effectiveness of the test-year concept. *Central Maine Power Co.* v. *Public Utilities Commission*, 153 Me. 228, 242-43, 136 A.2d 726, 735-36 (1957); *Public Service Co.* v. *State*, 102 N.H. 150, 162-63, 153 A.2d 801, 810 (1959).

On the other hand, we have never determined that the commission is *entirely* without discretion to adjust test-year data unless all relevant figures are ascertainable with complete exactitude. To do so would be, in our opinion, to bind the commission's hands in cases where flexibility is necessary to " 'do justice,' " to decide what is just and reasonable based on the evidence before it. *Rhode Island Consumers' Council* v. *Smith*, 111 R.I. at 289, 302 A.2d at 769, *quoting Narragansett Electric Co.* v. *Kennelly*, 88 R.I. 56, 73, 143 A.2d 709, 719 (1958). When the commission for articulated reasons determines that its figures are reliable and finds that an adjustment of the type made here is necessary to ensure that test-year data remains representative, we see no reason to deny the commission the discretion to act solely because it cannot do so with complete precision. *Cf. General Telephone Co.* v. *Public Service Commission*, 78 Mich. App. 528, 539-40, 260 N.W. 2d 874, 879 (1977) (once anticipated increases in directory advertising revenues were recognized, commission should have considered as well "somewhat speculative" wage increases).

With respect to the present controversy, there apparently exists little dispute that the $502,000 in increased revenues associated with the directory advertising rate increases constitute "just the sort of known and measurable future economic condition of which the authorities overwhelmingly approve." *Narragansett Electric Co. v. Harsch,* 117 R.I. at 418, 368 A.2d at 1207. Both the commission and the division agree, however, that the adjustment urged by Hartikka and accepted by the commission incorporates an expense figure that is not so thoroughly based on fact. The company contends that the expense figure is speculative and may therefore not be considered, with the result that it is equally inappropriate to consider the effect of the increased revenues; in so arguing it appears to rely upon the simple proposition that an "adjustment for changes in revenues occurring after the test year should require a commensurate change in expenses in the same period." *City of Pittsburgh* v. *Public Utilty Commission,* 187 Pa. Super. Ct. 341, 363, 144 A.2d 648, 660 (1958). *See also City of Los Angeles* v. *Public Utilities Commission,* 7 Cal. 3d 331, 346-47, 497 P.2d 785, 797, 102 Cal. Rptr. 313, 325 (1972). Although we have already stated that the general rule can accommodate less than mathematical precision, and have thereby affirmed that the treatment of post-test-year occurrences is, to a large extent, within the discretion of the commission, *Narragansett Electric Co. v. Harsch,* 117 R.I. at 417, 368 A.2d at 1207, the commission has in this case failed to demonstrate that its findings are based upon legally probative evidence; consequently, we must remand with directions that the commission provide us with that information or, if necessary, alter its decision. *Rhode Island Consumers' Council* v. *Smith,* 111 R.I. 271, 283, 302 A.2d 757, 765 (1973).

In its report and order the commission stated that rejection of Hartikka's recommended adjustment would "unfairly penalize the ratepayers." It may well be that to ignore altogether known revenues of such magnitude would detract from the representative nature of the test year, at the consumer's expense. This is especially so because, despite the

protests of the company's accounting witness, John F. O'Neill (O'Neill), that an analysis of the relevant expenses "would be quite long and complex because it involves a great number of departments and a great number of different items * * *," the company itself had already adjusted test-year data to reflect increased wage expense, which company figures in turn suggest accounted for about half of the total directory advertising expense. On the other hand, the report and order reveals that Hartikka based part of his calculations on the assumption that "directory advertising expense would increase by the same percentage that directory advertising revenues would be increased * * *," a theory that standing alone is too speculative to be relied upon. *Cf. General Telephone Co. v. Public Service Commission*, 78 Mich. App. 528, 540, 260 N.W.2d 874, 879 (1977) (conclusion that directory advertising revenues will increase at same rate as in past was probably too speculative for adoption). If and to the extent that the commission adopted that formula as a measure of directory advertising expense, we direct that on remand it exclude the arrived-at sum as an adjustment to test-year data.

In conclusion, we must remand so that the commission can detail its reasons for having adopted Hartikka's methodology,[7] both in general and specifically with regard to the

---

[7]Again, the possible inconclusiveness of the evidence here in question demonstrates that the commission must exercise great caution in making adjustments to known quantities on the basis of post-test-year events. *See City of Pittsurgh v. Pub. Util. Comm'n*, 187 Pa. Super. Ct. 341, 363, 144 A.2d 648, 660 (1958). Nevertheless, if the commission upon reconsideration and in light of this opinion determines that an adjustment cannot properly be made absent certain specific expense information that the company has not yet provided, but which is of the type that should be provided pursuant to G.L. 1956 (1977 Reenactment) §39-3-12, the commission should evaluate the company's actual ability to generate the information and then, if necessary, grant the company sufficient time to respond. For discussion of a similar problem pertaining to cost-of-service considerations, see *Blackstone Valley Chamber of Commerce v. Pub. Util. Comm'n*, 121 R.I. 122, 129-130, 396 A.2d 102, 106 (1979); *Rhode Island Consumers' Council v. Smith*, 111 R.I. 271, 299-300, 302 A.2d 757, 774 (1973); *Re New England Tel. & Tel. Co.*, 99 P.U.R.3d 228, 236 (R.I.P.U.C. 1973).

expense that was not wage related, and so that it can as well reconsider and perhaps modify its decision in light of what we have said here.

## B. *Going Basis Adjustments*

During the course of the hearings and in his prepared testimony, Hartikka recommended that certain "out-of-period accounting entries" adopted by the company be excluded from computation of the company's overall expense figure. The company's adjustments were intended to reflect what it considred typical expense changes of various kinds, namely, changes in the level of unemployment taxes, social security tax accruals, and medical insurance expenses. The commission accepted Hartikka's proposal to eliminate those out-of-period entries, thereby increasing pro forma intrastate earnings for the test period by $72,000.

The problem facing the commission in treating these out-of-period accounting entries is not unlike that which we have just discussed concerning directory advertising revenues. The commission must, when necessary, adjust test-year data so that it will reflect typical operating conditions and thereby hopefully prove representative of future conditions. *Narragansett Electric Co.* v. *Harsch*, 117 R.I. 395, 416-17, 368 A.2d 1194, 1206-7 (1977); *Rhode Island Consumers' Council* v. *Smith*, 113 R.I. 384, 397, 322 A.2d 17, 24 (1974). The commission had before it Hartikka's testimony that the disputed entries would have "distort[ed]" the company's actual test-year operating results; Hartikka had as a general matter suggested on cross-examination that, although future periods will probably require their own out-of-period adjustments, the unpredictability of the type, amount, and impact of such adjustments upon earnings makes untenable any theory that the future periods will be affected in much the same way as was a given test year.

Notwithstanding an apparent abundance of oral testimony before the commission both in support of and in opposition to use of the company's out-of-period entries as an acceptable indicators of similar future adjustments, the commission

found in its report and order that the company had "waived" whatever objection it might have had to Hartikka's proposal. The commission's conclusion might have resulted in part from the company's failure to brief its position with the vigor characteristic of its other efforts; indeed, the company had confined its remands on the issue to a footnote in its brief to the commission, declaring there, in part, that "[t]he position of the parties is sufficiently clear on the record * * *."

Our review of the commission's decision to accept Hartikka's recommendation cannot, however, turn upon the question of the existence and effect of an alleged waiver, because, in our opinion, the commission itself did not so limit its determination. Rather, despite its reference to waiver, the commission found quite specifically and as a matter of fact that "[t]he out-of period accounting entries * * * would, if included in test period operating results, have a distorting effect." Although that finding is presented without elaboration of any kind, it nonetheless makes clear both that the commission felt that there existed sufficient evidence of the type properly relied upon in making necessary factual determinations, and that the commission in fact acted on the basis of that evidence. Having so acted, it was incumbent upon the commission to support factually and legally its decision that exclusion of the entries was necessary to avoid distortion of the company's test-year operating results. *E.G., Rhode Island Consumers' Council* v. *Smith*, 111 R.I. 271, 285-86, 302 A.2d 757, 766-67 (1973). We must now remand this matter to the commission so that it may discharge that responsibility in a supplementary decision.[8]

---

[8]In its decision the commission made no reference to one other disputed out-of-period accounting entry, even though the company had challenged Hartikka's treatment of the item in that footnote to which we referred above. The entry involved a corrective adjustment (a "true-up") of the company's 1974 federal income tax liability that was not booked until September 1975. The company argued at length that, if the commission accepted Hartikka's other adjustments, consistency could be achieved only by use of a similar adjustment involving the true-up; the result would have been an increase of $61,000 in the company's revenue requirements. Hartikka, on the other hand, took a position that no further adjustment to the tax liability figure was necessary. Because the commission is already obliged to

## C. *Federal Income Tax Expense*

The final expense item challenged by the company raises a question not previously before the commission in the context of a New England tariff filing. The company contends that the commission acted arbitrarily when it adopted an adjustment designed to reflect supposed tax savings related to the company's participation in a consolidated federal income tax return filed by the American Telephone and Telegraph Company (AT&T).

The company has, for the past several years, joined the many other Bell Systems operating companies that, along with Western Electric, participate in AT&T's consolidated return. Certain tax advantages flow to AT&T as a result of that consolidated return, the most obvious being that the tax liability of the system as a whole is less than what it would be if the affiliated companies each filed a separate return. This situation exists in large part because AT&T itself issues a significant portion of the debt capital raised to finance system operation, with the result that the accompanying interest expense deductions are available to AT&T in the computation of its tax liability. There seems to be no dispute that, because of the system's internal accounting practices, AT&T itself retains the tax benefits resulting from the interest expense and does not utilize the savings so as to credit its operating companies, such as New England, directly. *See also Mountain States Telephone & Telegraph Co.* v. *Public Utilities Commission,* 195 Colo. 130, 138, 576 P.2d 544, 550 (1978); *Chesapeake & Potomac Telephone Co.* v. *Public Service Commission,* 230 Md. 395, 411-12, 187 A.2d 475, 484 (1963).

The company's position is essentially that the commission must for ratemaking purposes proceed as if there were no

---

support its explicit adoption of Hartikka's conclusion with regard to certain other out-of-period entries, we direct it to take the opportunity to explain as well its apparent acceptance of his recommendation concerning the September 1975 tax adjustment.

overall tax savings whatsoever; it argues that to use as a cost of service anything but what the company would pay in taxes if it filed a separate return is no less than to claim as a tax deduction the interest expense of another corporation. Hartikka, on the other hand, argued that, absent an adjustment to reflect an operating company's proportionate share of the total savings and thereby to lower that company's stated tax liability, "the Bell System as a whole would earn revenues including provisions for federal income taxes greater than the taxes actually payable* * *." *See also FPC* v. *United Gas Pipe Line Co.,* 386 U.S. 237, 244, 87 S. Ct. 1003, 1007, 18 L. Ed. 2d 18, 24 (1967).

The commission agreed with Hartikka's assessment of the problem and accepted as the solution a tax adjustment recommended by an accounting committee of the National Association of Railroad and Utility Commissioners (NARUC). Hartikka explained that the NARUC adjustment, which takes into consideration the fact that the company is not wholly owned by AT&T, "allocates total system debt among the operating companies in proportion to their relative average capital obligations associated with AT&T ownership." The difference between the allocated debt and the debt of each company constitutes the AT&T debt allocated to that company, which in turn determines the amount of interest expense allocated. Using this formula, Hartikka concluded that the company's share of the AT&T tax savings applicable to its intrastate oprations totalled $139,332 for 1975 and $238,073 for 1976, or $196,931 for the test year. The effect of the decreased tax liability recognized by the commission was to increase the company's pro forma intrastate earnings by $144,000.

We have stated in the past that, when reviewing a decision of the commission, our concern is not with the method used to attain a particular result but with the fairness and reasonableness of the end result itself. *Narragansett Electric Co.* v. *Harsch,* 117 R.I. 395, 418, 368 A.2d 1194, 1208 (1977), *citing FPC* v. *Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S. Ct.

281, 287-88, 88 L. Ed. 333, 344-45 (1944). In this case we find nothing to indicate that the commission's action was unjustified. Indeed, keeping in mind that the determination of what is fair and reasonable requires a balancing of investor and consumer interests, *FPC* v. *Hope Natural Gas Co.*, 320 U.S. at 603, 64 S. Ct. at 288, 88 L. Ed. at 345, we agree with one commentator's statement that in general "[i]t seems difficult to resist the * * * argument that a Bell subsidiary's ratepayers should not be called upon to meet tax outlays greater than the subsidiary's allocated proportion of the system's tax liability * * *." 1 Priest, *Principles of Public Utility Regulation* 58 (1969).

The commission utilized the NARUC tax adjustment in order to ensure that recovery not be allowed for an overall tax expense never in fact incurred. *Rhode Island Consumers' Council* v. *Smith*, 113 R.I. 384, 396, 322 A.2d 17, 23 (1974), *citing FPC* v. *United Gas Pipe Line Co.*, 386 U.S. 237, 244, 87 S. Ct. 1003, 1007, 18 L. Ed. 2d 18, 24 (1967). Contrary both to the suggestion of the company and to the view of the minority of jurisdictions to consider this problem, *e.g.*, *Re Diamond State Telephone Co.*, 51 Del. 525, 532-33, 149 A.2d 324, 328-29 (1959); *General Telephone Co.* v. *Public Utilities Commission*, 174 Ohio St. 575, 577-80, 191 N.E.2d 341, 343-44 (1963), we do not feel that adoption of the NARUC formula either improperly ignores the separate corporate identities of New England and AT&T or in any impermissible way invades the conceded prerogatives of New England's management to achieve what it considers its maximum prudent debt ratio. Indeed, if there has been any limited disregard of separate corporate identities, it is unquestionably because AT&T and New England themselves have chosen to disregard their separateness for income tax purposes. The NARUC adjustment recognizes only that it is the commission's responsibility to determine the company's allowable tax expense and that its duty cannot be discharged properly if the commission is bound by figures that would appear on a separate return that the company in fact did not file. *See Chesapeake & Potomac Telephone Co.* v. *Public*

*Service Commission,* 230 Md. 395, 413, 187 A.2d 475, 485 (1963); *United Inter-Mountain Telephone Co.* v. *Public Service Commission,* 555 S.W.2d 389, 393 (Tennessee, 1977). We hold that the commission did not abuse its discretion by disallowing a claimed federal income tax expense that was greater than the company's proportionate share of the consolidated tax liability.

## Rate of Return

Once again we observe that the overall rate of return allowed a utility is that percentage by which the intrastate rate base is multiplied in order to determine a figure that allows the utility to collect revenues sufficient to pay operating expenses and to attract investment capital. We have consistently adhered to the standard of reasonableness as the means by which to measure the validity of the commission's rate-of-return determination. *E.G., Providence Gas Co.* v. *Burman,* 119 R.I. 78, 87, 376 A.2d 687, 695 (1977). In order to meet this standard, the rate of return must provide the utility with the opportunity to earn a return on its rate base approximately equal "to the returns generally achieved at the same time and in the same general part of the country on investments in other enterprises having corresponding risks and uncertainties." *Rhode Island Consumers' Council* v. *Smith,* 111 R.I. 271, 293, 302 A.2d 757, 770 (1973).

In this proceeding the commission determined, as follows, that 8.6% constituted a fair overall rate of return on the company's rate base:

### New England Telephone and Telegraph Company
### July 31, 1976

| Type of Capital | Amount (Thousands) | Capital Structure | Cost Rate | Weighted Cost |
|---|---|---|---|---|
| Long Term Debt | 1,565,991 | 43.551% | 7.035% | 3.064% |
| Deferred Taxes | 303,549 | 8.442% | 0 | 0 |
| Common Equity | 1,726,111 | 48.001% | 11.53% | 5.535% |
| | | | | 8.599% |

That rate of return is presumed reasonable and will not be disturbed upon review unless the company "satisfies us by

clear and convincing evidence that it is clearly, palpably and grossly unreasonable." *Rhode Island Consumers' Council* v. *Smith*, 111 R.I. 271, 295, 302 A.2d 757, 772 (1973).

By far the most uncertain and, therefore, disputed component of the commission's rate-of-return calculations is the company's cost of common equity. The cost of equity, unlike that of debt, cannot be accurately predicted by the company because there exists no fixed agreement between the company and the equity holders concerning, say, dividends. John W. Wilson (Wilson), witness for the division, estimated the cost of equity to be 11.0%. The company's three rate-of-return witnesses, Robert E. La Blanc, Robert S. Stich, and John H. Cogswell, each suggested what he considered an acceptable range in the estimated cost of equity, the overall range being approximately 14.7% - 16.3%. The commission, however, rejected the company's figures and settled upon 11.53% as the cost of equity and 8.6% as the overall rate of return. The company appeals from that determination.

There are basically two facets to the company's argument. First, it contends that the allowed rate is deficient in that it denies the company the ability to maintain stock healthy enough to withstand the market pressure and costs that accompany new stock issues — factors that might otherwise depress the market price of the company's stock to a level below book value. In making this argument, the company relies heavily upon *New England Telephone & Telegraph Co.* v. *Department of Public Utilities*, 371 Mass. 67, 76, 354 N.E.2d 860, 867 (1976), in which the Massachusetts court stated that "[i]f new stock yields net proceeds less than book value, the equity of existing stockholders is diluted; and forced dilution is confiscation, at least in the absence of some explanation * * *." The short answer to the company's argument is that we faced precisely this problem and rejected the company's position in *Providence Gas Co.* v. *Burman*, 119 R.I. 78, 97, 376 A.2d 687, 697 (1977); despite the company's claims to the contrary, we see nothing to distinguish that case from the one presently before us.

As we observed in *Providence Gas Co.* v. *Burman,* 119 R.I. at 96, 376 A.2d at 697, the Massachusetts court itself cautioned that the proper rate of return is "a 'matter of judgment,' not 'an immutable number.' " *New England Telephone & Telegraph Co.* v. *Department of Public Utilities,* 371 Mass. at 76, 354 N.E.2d at 866. In this case, as in *Burman,* the company itself presented evidence tending to refute the contention that its market-to-book ratio must approximate 1.2:1; indeed, the commission notes that only seven of 99 electric utilities studied for purposes of comparison had market-to-book ratios of 1.2:1 or higher and that the average for the group was 0.96:1. There is obviously no assurance, especially where actual dilution has not been shown, that the rate of return determined by the commission will not "provide an attractive investment possibility to the market community." *Providence Gas Co.* v. *Burman,* 119 R.I. at 96, 376 A.2d at 697. In *Burman* we noted both the lack of certainty that any reasonable rate of return will ensure that the market price of stock does not fall below book because of an issuance and that in any event — notwithstanding the Massachusetts decision — evidence of such a slip does not automatically establish confiscation. *Id.*

The company further contends, however, that the commission's determination of 11.53% as the cost of equity is also invalid because it is wholly without evidentiary support. Its reasoning is that all rate-of-return witnesses — including John W. Wilson — recognized the appropriateness of *some* pressure adjustment and that their differences involved degree only. The commission, on the other hand, allegedly set a rate of return with no allowance for pressure and thus acted in disregard of all record evidence. It seems clear to us, upon examination, that the commission's finding is in fact both reasonable and based upon the evidence before it.

The commission placed primary reliance for its conclusions regarding cost of equity upon Wilson's study of 99 electric utility companies, utilities found comparable for purposes of analysis. Wilson's conclusion was that the average total cost of common equity for those utilities in 1975 was 10.89%, a

figure derived from application of a discounted cash flow analysis. In *Providence Gas Co.* v. *Burman*, 119 R.I. 78, 95, 376 A.2d 687, 696 (1977), we explained that the discounted cash flow analysis "is an investor-oriented method that determines a utility's required return on equity. The formula and mathematics involved are no less 'complex and abstruse' than they were in *Rhode Island Consumers' Council* v. *Smith*, 111 R.I. at 295, 302 A.2d at 771." However, the reliability of Wilson's approach was emphasized by the fact that a company study of the same 99 utilities, although analytically not precisely comparable, suggested cost figures quite similar to those arrived at by Wilson. It is true that Wilson adjusted his figures to account for the effect of market pressure and expenses of issue; however, his recommendation that the commission base its determination upon an 11.0% cost of common equity capital *reflected* an allowance of 0.15% – 0.35%, calculated quite specifically "to permit New England Telephone common stock to trade in a normal range centered at book value * * *." Thus, given that the commission was entitled to accept as within a zone of reasonableness Wilson's analysis of data relied upon by both parties, we find it difficult to understand how an even higher cost of equity figure — 11.53% — can be said to ignore completely the effect of market pressure. This is no less true simply because the commission, "convinced that the position of New England equity in the financial markets has not deteriorated" in the recent past, chose to retain the cost-of-equity figure accepted by it in the company's last general tariff filing. For the above reasons we find no fault with the commission's determination.

### Erosion

In its report and order, the commission acknowledged its duty to recognize, if appropriate, the company's inability to earn the rate of return allowed it because of the effects of inflation. *Narragansett Electric Co.* v. *Harsch*, 117 R.I. 395, 420-21, 368 A.2d 1194, 1209 (1977); *Rhode Island Consumers' Council* v. *Smith*, 113 R.I. 232, 247, 319 A.2d 643, 651 (1974). The company insisted, and the commission agreed, that an upward adjustment of $2,025,000 to rate

base would be necessary to neutralize the effects of erosion upon the company's rate of return. The division, however, has contended both before the commission and on appeal that the projected erosion figure, because only an estimate — and in this case a poor one — of the company's revenues, expenses and investment during a period after the close of the test year, has no validity as part of this ratemaking proceeding.

Initially, we must reject the division's apparent suggestion that the erosion figure is invalid simply because it is a projected figure. In *New England Telephone & Telegraph Co. v. Public Utilities Commission*, 118 R.I. 570, 581, 376 A.2d 1041, 1047 (1977), we observed that the erosion adjustment, "much more than the remainder of the commission's decision, is intended to be a forecast of future economic events." Indeed, the imprecision of the erosion adjustment is inevitable given the fact that the commission must attempt to predict the level and effect of inflation. Also, the accuracy of the prediction was undoubtedly increased somewhat by the introduction of supplementary testimony by company witness O'Neill, which contained actual updated operating results through March 31, 1977. Nonetheless, the commission obviously did not disagree completely with the division's assessment of the company's measure of erosion. The commission's report and order states:

> "The most striking feature of the Company's methodology is its lack of supporting details. The data was presented as a conclusion rather than [as] a methodology. The Division's criticism that the projection 'is totally lacking in theoretical foundation' and 'simply not susceptible of rational analysis' [is] not without merit. The Company's projections as presented did not contain sufficient 'theoretical foundation and supporting detail' to be convincing."

Given the commission's own criticism of the methodology utilized by the company, we find it unnecessary to speculate whether the company's partial update of its figures sufficiently lessened the rather pronounced uncertainty surround-

ing its projection. Rather, because we must in any event remand this case to the commission, we direct that on remand the commission compare its forecast with the company's actual operating results. *New England Telephone & Telegraph Co.* v. *Public Utilities Commission*, 118 R.I. 570, 595, 376 A.2d 1041, 1047 (1977); *Rhode Island Consumers' Council* v. *Smith*, 111 R.I. 271, 298, 302 A.2d 757, 773 (1973).

### Cost of Service

At the hearing, the division moved to dismiss the company's entire filing on the ground that the commission could not, consistent with the Legislature's prohibition against unreasonable, unjust, or discriminatory rates, G.L. 1956 (1977 Reenactment) §39-2-1, -2, -3, approve a tariff filing if the company's rate structure was not based upon cost-of-service considerations.

The commission found "as a fact * * * that the filing [was] based almost exclusively on a value of service rate design, which is substantially unrelated to the cost of providing service." Despite what it termed "strong misgivings" about the validity of such a rate design, the commission denied the division's motion to dismiss. Its stated justification for the denial was that

> "despite previous regulatory and judicial criticism of the value of service concept, dismissal of the present docket would constitute a major change in the governing regulatory standard for which 'there should ordinarily be warning sufficient to adjust both the practice and proof to the new situation.' *New England Telephone & Telegraph Co.* v. *Department of Public Utilities*, 371 Mass. 67, 84, 354 N.E.2d 860, 871 (1976)."

The commission nonetheless gave the company clear warning that it would not again approve a tariff filing absent the availability of a fully allocated cost-of-service study.

This controversy does not require us to decide specifically whether a cost-of-service study is a prerequisite to the

commission's approval of a tariff filing.[9] We reach that conclusion because, even *assuming* both that a cost-of-service study is necessary and that the company did not meet its burden to produce the cost data, we feel that the commission could legitimately delay requiring the data if it believed that without that delay the company could not compile the information.

We have stated recently that a fully allocated cost-of-service study, if necessary, would by no means constitute the only evidence to be considered by the commission in passing upon a proposed tariff filing. In *United States* v. *Public Utilities Commission,* 120 R.I. 959, 968, 393 A.2d 1092, 1097 (1978), we observed that

> "[o]ther factors, such as value of service to the community, historical rate design, adequacy of service, environmental considerations, the public benefit and the like, may warrant a departure from or a modification of the rates dictated by cost-of-service." *Payne* v. *Washington Metropolitan Area Transit Commission,* 415 F.2d 901, 916 (D.C. Cir. 1968).

In *New England Telephone & Telegraph Co.* v. *Department of Public Utilities,* 371 Mass. 67, 84, 354 N.E.2d 860, 871 (1976), upon which the commission relied in deciding that the company should be given additional time to compile cost data, there had been no finding that the company failed to justify its proposed tariff filing under the standards traditionally followed by the department. Similarly, we find no indication here that the company has failed to produce the kind of evidence accepted, although at times reluctantly, by the commission in the past. *Re New England Telephone & Telegraph Co.,* 99 P.U.R.3d 228, 236 (R.I.P.U.C. 1973).

---

[9]Although this court has never decided whether a cost-of-service study is a necessary part of the company's filing, we have recently remanded a case to the commission for its view on that very issue. *United States* v. *Pub. Util. Comm'n,* 120 R.I. at 959, 969, 393 A.2d 1092, 1096 (1978).

Although the commission has announced that it will no longer accept that type of evidence alone, we feel that it acted properly by making that rule applicable to future rate proceedings only.

## Conclusion

Insofar as the company's appeal is concerned, its petition as it relates to the accrued interest expense is granted, and the petition is denied in those portions that relate to the gross receipts tax expense, federal tax expense, and rate of return. Insofar as the division's appeal is concerned, its petition as it relates to the necessity of a cost-of-study is denied.

Furthermore, the records certified to this court are ordered returned to the commission with the direction that it review the evidence and testimony in the present record as it pertains to the directory advertising rate increases, going basis adjustments, average cash allowance, and the erosion adjustment. The record may be supplemented by such further testimony as may be offered pursuant to the petition of any party or by the commission's own direction, and it then shall make further findings and orders that relate to the issues to which we have just alluded and which are in harmony with the opinion. Thereafter, any party dissatisfied with the commission's supplementary orders may, by a motion filed in this court within 20 days following the commission's action, bring the matter before us for further consideration.

*Dennis J. Roberts II*, Attorney General, *Gregory L. Benik, R. Daniel Prentiss*, Special Assistant Attorneys General, for Julius C. Michaelson and Division of Public Utilities and Carriers.

*Tillinghast, Collins & Graham, Peter J. McGinn, Mark A. Pfeiffer, Richard W. Blackburn*, for New England Telephone and Telegraph Company.