NEW ENGLAND TELEPHONE &
TELEGRAPH COMPANY

v.

PUBLIC UTILITIES COMMISSION
et al.

No. 81–463–M.P.

Supreme Court of Rhode Island.

April 28, 1983.

Tillinghast, Collins & Graham, Peter J. McGinn, Peter V. Lacouture, Steven E. Snow, Providence, for petitioner.

Carroll, Kelly & Murphy, C.R. Bengtson, Richard D. Prentiss, Edwards & Angell, James K. Edwards, Ricci & Ricci, Hugo L. Ricci, Jr., Providence, for respondent.

## OPINION

WEISBERGER, Justice.

This is a statutory petition for certiorari filed by the New England Telephone & Telegraph Company (the company or NET) seeking to review portions of reports and orders rendered by the Public Utilities Commission (the commission) on September 13, 1981, and October 20, 1981. The petition is filed pursuant to the provisions of G.L.1956 (1977 Reenactment) § 39–5–1. In its petition the company raises five major issues. These issues will be dealt with in the order in which they are presented in the company's brief. The facts pertinent to the disposition of these issues will be supplied as required.

## I

### Allowance for Erosion

This court has held in previous cases that a public utility is entitled to an erosion or attrition allowance in order to compensate for its inability to earn the rate of return authorized by the commission because of the effects of inflation. *Michaelson v. New England Telephone & Telegraph Co.*, 121 R.I. 722, 746, 404 A.2d 799, 812 (1979); *New England Telephone & Telegraph Co. v. Public Utilities Commission*, 118 R.I. 570, 582, 376 A.2d 1041, 1047 (1977); *Narragansett Electric Co. v. Harsch*, 117 R.I. 395, 420–21, 368 A.2d 1194, 1209 (1977). The commission has previously recognized the propriety of an erosion allowance in rate hearings and has granted such an allowance in the case at bar. This allowance, however, is claimed by the company to be wholly inadequate.

In testimony given by John F. O'Neill, an expert accounting witness, the company sought to establish a failure on its part to achieve an authorized rate of return, due to the effects of inflation. Such a contention is supported by projections of test-year figures and also by actual earnings, resulting from operations during the twelve months subsequent to the test period. Mr. O'Neill's testimony resulted in the conclusion that the test-period's adjusted actual rate of return amounted to 7.6 percent.[1] He then compared this rate of return with the authorized rate of 8.6 percent. The failure to achieve the authorized rate of return, the witness asserted, was due to the effects of inflation. This caused a revenue deficiency of $4,793,000 with a resulting earnings deficiency of $2,381,000. The company proposed an erosion adjustment in the sum of $4,793,000.

---

1. The adjustment had been adopted by the commission and by this court in docket No. 1251, a prior rate hearing.

In opposition to this testimony, the Division of Public Utilities & Carriers (the division) presented the testimony of Dr. John W. Wilson, an expert witness. Doctor Wilson did not specifically contradict or rebut the methodology or the calculations used by Mr. O'Neill in arriving at his estimate of revenue shortfall. His criticism of the O'Neill conclusion was based upon the assertion that it did not include probable gains in productivity and market growth. Wilson based his testimony of probable gains in productivity and market growth upon an item extracted from a paper published in the Spring 1973 issue of the *Bell Journal*. The projections included in this paper were based upon Bell System figures for the 1961–71 period.

A subsequent company witness, Professor Frank M. Gollop of the Department of Economics of Boston College, testified that this paper had never been used for financial or economic planning by the American Telephone & Telegraph Company (AT & T), that it had no relation at all to the operating company whose rates were under consideration, and that it was not useful or even relevant to the determination of an erosion allowance for the company. Nevertheless, Dr. Wilson asserted that the company should not be entitled to an attrition allowance because of its failure to reflect, in its erosion figures, gains in productivity and volume in accordance with the *Bell Journal* model. We have carefully examined Dr. Wilson's testimony in the light of rebuttal testimony by Mr. O'Neill and Prof. Gollop and are of the opinion that his testimony, on this subject, constitutes baseless speculation and does not reach the threshold of competent legal evidence.

In its report and order, the commission did not accept Dr. Wilson's testimony that no erosion allowance should be made because the company had omitted "consideration of key variables reflecting market growth and productivity gains." The commission agreed with Prof. Gollop that Dr. Wilson's testimony lacked "specific quantitative support on which we may make an erosion allowance calculation." The commission found that erosion probably exists, "but to a degree that cannot be calculated directly from the cases submitted by the company and the division." The commission then proceeded to determine an erosion allowance based upon expenses from which payroll and depreciation were omitted. The commission further excluded from its calculations, the company's additional investment because such an investment should be offset by additional revenue generated thereby. This adjustment gave rise to an erosion allowance of $948,000. After considering the evidence presented to the commission, we are of the opinion that the company's evidence was unrebutted by any competent legal evidence presented by the division. We believe that the company's evidence did include projections of productivity gains and reasonably anticipated market growth. The testimony of Mr. O'Neill and Prof. Gollop on these issues stands unassailed.

In light of this evidence, the elimination of approximately 80 percent of the expense and investment base for determining an erosion allowance is, in our opinion, not supported by competent legal evidence and is not justified on the theory that an erosion allowance is not designed to guarantee the company's achieving its authorized rate of return. *New England Telephone & Telegraph Co. v. Public Utilities Commission,* 118 R.I. at 588, 376 A.2d at 1050.

Mr. O'Neill's projected figures from the test year supported the company's proposed erosion allowance. Furthermore, the figures from the twelve months subsequent to the test period gave almost irrefutable evidence of the company's declining intrastate rate of return. Therefore, in the light of this evidence, the rejection of the company's proposal was arbitrary. Thus, we sustain the company's position on this issue and order that the commission include in the tariff an erosion adjustment in the amount of $4,793,000.

## II

### *License-Contract Expenses*

The company included in its cost of doing business certain license-contract expenses relating to services performed by AT & T for the benefit of all of the telephone operating companies. These expenses are allocated to each operating company on the basis of a contract executed July 15, 1930. The total contract expenses for the period of twelve months ending August 31, 1980, came to $3,025,227. Of the expenses sought to be included in the new tariff, the commission disallowed the sum of $636,768. This disallowance included the sum of $209,022 allocated to the company as its share of defending the government and private antitrust actions brought against AT & T and its operating companies. NET was a defendant in certain private antitrust actions and was named as a coconspirator in the government antitrust action.

 The commission disallowed these expenses of litigation "as a matter of policy." In support of its disallowance the commission observed:

"Those suits challenge AT & T's vast national and international corporate structure and operations, not NET's activities within the State of Rhode Island. The costs of defending against those suits properly belongs with either the interstate ratepayers who use AT & T's full network or with the AT & T shareholders who bear the risk of management policy decisions at the highest corporate levels; in any event those costs should not be borne by the Rhode Island intrastate ratepayers."

The foregoing resounding statement of policy has a superficially alluring quality. Nevertheless, in this day of litigation explosion, the cost of defending against a variety of actions, both governmental and private, is a necessary and reasonable expense to be included in the cost of doing business. Actions may be brought against any company, including a public utility, for negligence, defects in products manufactured or sold, sex discrimination, age discrimination, or the violation of a profusion of municipal, state, or federal regulations that approach infinity in their number and variety. Antitrust actions are a part of such potential challenges and do not constitute, in our opinion, a type of action which should be defended only by the stockholders of a public utility, presumably from the stated capital, capital stock or retained earnings of the corporation. Perhaps no area of the law is more fraught with doubt and dispute than the principles underlying antitrust litigation. The suggestion that the mere bringing of such an action gives rise to a presumption of impropriety and illegal conduct on the part of the defendants is in derogation of the basic principles underlying our adversary system.

 We agree that the company should bear only that portion of litigation expenses for antitrust actions which is reasonable in light of the overall corporate structure of AT & T. Nevertheless, since NET has been named as a defendant or coconspirator in these actions, the company must obviously defend against them.

By excluding such expenses "as a matter of policy," we are constrained to the conclusion that the commission's disallowance of such expenses was based upon the nature of the action rather than on a determination of the company's appropriate allocation of expense. General Laws 1956 (1977 Reenactment) § 39–3–30 provides for the disallowance of payments made to an affiliate for services rendered or property purchased under existing contracts unless such public utility shall establish the reasonableness of such payment or compensation. In this case the commission has not challenged the reasonableness of the charge or allocation of expense. Rather it has adopted the sweeping principle that antitrust-litigation expense is unreasonable per se as a charge to be made. to the ordinary and necessary expenses of doing business. We cannot approve this principle. Consequently, we are

of the opinion that this disallowance was improper and arbitrary.

■ In respect to the exclusion of other license-contract expenses, we believe that this exclusion was based upon the expert testimony of a division witness, Alan Buckalew. We have carefully examined the testimony of Mr. Buckalew as well as the testimony of Timothy F. Linehan and the rebuttal witness of the company, John H. Hann. We conclude that Mr. Buckalew's testimony, in regard to other excluded expenses, though vigorously criticized in the company's brief, does constitute competent legal evidence. We are therefore compelled to uphold the determination of the commission in respect to these other items. *Providence Gas Co. v. Burke*, 119 R.I. 487, 380 A.2d 1334 (1977).

### III

*Allocation of Hypothetical Interest to Investment Supplied by Job Development Investment Credits*

■ Pursuant to provisions of the Federal Revenue Act of 1971, the company has availed itself of certain investment credits referred to as Job Development Investment Credits (JDIC). Pub.L. No. 92–178, § 101, 85 Stat. 497 (1971). As part of its interest-synchronization adjustment, the commission allocated hypothetical interest to investment represented by JDIC. The company argues that this allocation imperils its future entitlement to such credits. It is undisputed that the company's rate base included $10,331,000 of investment supplied by JDIC. Such capital is provided for the company's use without interest. The division's expert accounting witness, Aarne Hartikka, recommended this assignment of hypothetical interest. However, he agreed that there would be an "unquantifiable risk" associated with his recommendation which would result in a forfeiture of the credit. Therefore he suggested that it might be a good idea to seek an internal revenue ruling on the question.

At the hearings before the commission, the company's position was that the actual interest reflected on its books, during the test year should be utilized in arriving at a revenue requirement. This contention was rejected by the commission relying at least in part upon its former decision in docket No. 1251. However, in that docket, Mr. Hartikka conceded that the amount of interest assigned was no greater than the actual interest on the books and records of the company. Thus, additional interest was not assigned to that portion of the rate base presented by the JDIC funds. Mr. Hartikka suggested that this ultimate result may or may not have been intentional. Nonetheless, such was the effect since the book-interest expense in docket No. 1251 "exceeded the pro forma interest expense amount" which he derived by applying the weighted debt cost rate to the rate base, plus construction work in progress. The company does not now challenge the application of pro forma rather than the actual interest figures save, those assigned to JDIC funds.

We have examined the testimony of Dr. Wilson, Mr. Hartikka, and the company's accounting witness, Mr. O'Neill. After considering this testimony, we are of the opinion that there is no competent legal evidence to support the assignment of a hypothetical rate of interest to these JDIC funds that are supplied interest free. We are further persuaded that there is a distinct possibility of the loss of these credits to the company in the event that this method of allocation is adopted.[2] We believe that ultimately, the Rhode Island rate payers will benefit by treating these JDIC funds in their actual rather than hypothetical context, since the latter may jeopardize their availability. *See Rhode Island Consumers Council v. Smith*, 113 R.I. 232, 242–43, 319 A.2d 643, 648–49 (1974).

---

**2.** *See* 26 U.S.C.A. § 46(f)(2)(A) and (B) (West 1981); *see also* 26 C.F.R. §§ 1.46–6(b)(3), (4)(ii) and (iii) (1982). Both the code and the regulations seem to suggest that any rate making decision that utilizes such funds to reduce the cost of service may affect eligibility.

As a consequence, the commission is ordered to recompute its interest synchronization, after eliminating from the base to which the hypothetical interest is applied, the JDIC funds amounting to $10,331,000. In the event that the commission should prefer to utilize, in its computation, the actual interest expense during the test year, it may do so as an alternative in light of this ruling. However, the selection of such an alternative would be optional with the commission.

## IV

### *Authorized Rate of Return Utilizing the Technique of Direct Double Leverage*

■ In its initial report and order entered on September 13, 1981, the commission authorized a rate of return on equity capital of 15.1 percent. This determination is not challenged on review. However, in applying this rate of return, the commission used a technique known as direct double leverage. In its supplemental order entered October 20, 1981, the commission determined through its application of direct double leverage, that an 11.48 percent overall rate of return should be applied to the company's rate base in order to produce a rate of return of 15.1 percent. This rate would then be applied to the common stockholders of AT & T, who are in essence the owners of equity in NET. The company vigorously opposed this determination by asserting through its expert witness that such an overall rate of return is inadequate to reflect the risk associated with capital investment.

In *Bristol County Water Co. v. Harsch,* 120 R.I. 223, 232–39, 386 A.2d 1103, 1109–12 (1978), this court considered the application of direct double leverage in respect to a utility company that was owned in significant proportion by parent companies. Justice Kelleher analyzed the technique of applying this concept and determined that it was a permissible alternative. He concluded by observing,

"We will not interfere with the rate of return established by the commission unless we are satisfied by clear and convincing evidence that the rate is clearly, palpably, and grossly unreasonable. *New England Telephone & Telegraph Co. v. Public Utilities Commission,* 118 R.I. 570, 376 A.2d 1041 (1977)." 120 R.I. at 239, 386 A.2d at 1112.

The terminology and the testimony of expert witnesses in the *Bristol County Water* case and the case at bar, achieve flights of rare sophistication, into the arcane and the incomprehensible. However, the utilization of direct double leverage, to arrive at an overall rate of return, can be reduced to an understandable framework. The principle behind the concept may be stated in terms of its objective. The objective is to apply the equity rate of return only to that portion of capital investment which represents stockholders' equity. That portion of the capital investment which represents funded debt or preferred stock should be compensated only at the weighted average cost of that debt or preferred capital. In sum, if a percentage of the rate base represents debt with an average cost of 8.72 percent (as was the case in respect to this company), that portion of its rate base should not receive the common equity return of 15.1 percent.

In dealing with a wholly owned subsidiary, that portion of capital investment which represents funded debt or preferred stock, in both the subsidiary and the parent should be calculated and deducted from the rate of return before the return on equity investment is allocated.

In spite of the extreme positions taken by Dr. Wilson on behalf of the division and John H. Cogswell on behalf of the company, we are of the opinion that the commission achieved a just and reasonable result. In its supplemental order, using figures from the balance sheets of AT & T and the company, the following tabular exposition was set forth.

| | | Amount (000) | Weight | Cost | Weighted Cost |
|---|---|---|---|---|---|
| **AT&T** | | | | | |
| | Long Term Debt | $ 7,313,100 | 12.45% | 6.5% | .81% |
| | Preferred stock | 1,959,700 | 3.33 | 7.6 | .25 |
| | Common Equity | 49,474,800 | 84.22 | 15.1 | 12.72 |
| | Total Capital | $58,747,600 | 100.00% | | 13.78% |
| **NET** | | | | | |
| | Long Term Debt | | 45.6% | 8.72% | 3.98% |
| | Common Equity | | 54.4 | 13.78 | 7.50 |
| | Total Capital | | 100.00% | | 11.48% |

We have computed each step in the commission's calculations and find that an overall rate of return of 11.48 percent, applied to the company's rate base, will produce a 15.1 percent return to common equity. This is illustrated in the accompanying table. In order to achieve this result, the calculation of return on $1,000 of the rate base, from which the debt cost and preferred stock cost of both corporations have been eliminated, produces the appropriate rate of return precisely as the commission has set it forth.[3] In its brief the company talks in terms of varying risks encountered by the company's capital. It argues that NET's retained earnings should be considered as well as capital stock. The difficulty with the company's position is that Dr. Wilson's more extreme suggestions were eliminated by the commission. There is no dispute concerning the balance-sheet figures used. No one suggests that these figures are inaccurate. We agree with the company that retained earnings, in accordance with generally accepted accounting principles, form a part of common equity. It is also true that the commission has authorized a return on NET's common equity of 13.78 percent. However, under the direct double leverage theory, the critical application of equity return occurs at the point where such capital is contributed, namely the common equity of AT & T. At this crucial point, the commission has authorized a return of 15.1 percent.

Since the commission's order provides a reasonable rate of return, 15.1 percent, on that portion of owners' equity to which it should appropriately apply, the commission has performed its duty. The fact that AT & T used its shares of stock to purchase the remaining outstanding interest in NET is, for this purpose, irrelevant.

As a consequence, the commission's reports and orders setting the authorized rate of return at 11.48 percent upon NET's rate base and establishing a return on AT & T's common equity of 15.1 percent through the technique of direct double leverage are sustained.

V

*Authorization of Across-the-Board Increases on Only Competitive Products and Services*

By reason of the company's failure to provide a fully allocated cost-of-service study, the commission in its order of May 19, 1981, dismissed the company's requests for rate relief insofar as they related to the company's noncompetitive products and services. We sustained this dismissal in *New England Telephone & Telegraph Co. v. Public Utilities Commission*, R.I., 446 A.2d 1376 (1982), with regard to all noncompetitive services except basic-exchange service.

---

**3.** Our computation of the rate of return to AT & T stockholders under equity leverage as applied by the commission appears as appendix A to this opinion.

In respect to basic exchange, no one disputed that the company provided service at a rate significantly less than cost.

In that case the company argued, as it does in the case at bar, that the requirement of a fully allocated cost study was burdensome and unnecessary. The company further argued that it had provided the commission with the most comprehensive cost evidence ever presented by the company to any regulatory body in New England. The company makes the identical argument in the instant case. We rejected these arguments then and observed:

> "This self-laudatory citation does nothing to advance NET's argument; the focus of the inquiry is not the magnitude of the individual work papers submitted but the nature and quality of the cost evidence. We find no merit to NET's claim that its so-called FACS [fully allocated cost study] represents a genuine good-faith effort to produce a cost study conforming to these criteria, given as NET would have it, the ambiguity with which the criteria are imbued and the wholly unanticipated interpretation attributed to them by the commission. For reasons already discussed, we do not regard these cost standards ambiguous, nor do we believe the commission's interpretation thereof to be a marked and unexpected departure from its prior pronouncements. Further, the commission noted that at no time had NET requested clarification or reconsideration of these standards." *Id.,* 446 A.2d at 1387.

Our opinion in the former case is entirely dispositive of the arguments now made by the company that the commission's insistence upon a fully allocated cost study was erroneous. In the present case, the commission has simply set forth requirements consistent with those promulgated in its order of May 19, 1981.

■ The company further argues that the commission was in error in determining that certain services were noncompetitive. The rulings questioned related to private-line services and a directory-assistance re-

pricing plan. We have examined the evidence concerning the alleged noncompetitive nature of these services and find that it amply supports the commission's finding that the services in question were noncompetitive and therefore not subject to an increase without the necessary predicate of a fully allocated cost-of-service study.

■ The commission also rejected the company's proposal to establish a flexible tariff in respect to the regulated pricing of competitive terminal equipment products. The commission's rejection was based upon its belief that such a flexible tariff would in effect constitute an elimination of regulation. The commission found "this proposal to be unacceptable on its face as being contrary to our established regulatory practices * * *." We agree. As long as these products and services are subject to regulation, allowing increases to be made merely by notice to the customers and to the commission, as suggested in the filing, would in effect be an abdication of the commission's function.

In light of our limited standard of review under which we do not engage in factfinding or weigh conflicting evidence presented to us by the commission, *Michaelson v. New England Telephone & Telegraph Co.,* 121 R.I. 722, 728, 404 A.2d 799, 803 (1979); *Blackstone Valley Chamber of Commerce v. Public Utilities Commission,* 121 R.I. 122, 127, 396 A.2d 102, 105 (1979), we find no basis to fault the commission on any of the issues raised by the company in support of its challenge to this portion of the report and order.

## VI

### *Conclusion*

For the reasons stated, the company's petition for certiorari is granted insofar as it relates to (1) allowance for erosion, (2) license-contract expenses in respect to antitrust litigation, and (3) allocation of hypothetical interest to investments supplied by JDIC. Therefore those portions of the commission's reports and orders relating to the

foregoing subjects are hereby quashed. Insofar as the company's petition relates to (1) the authorized rate of return, utilizing direct double leverage, (2) the restriction of authorized increases to competitive services and (3) the defining of certain services as noncompetitive, it is hereby denied and dismissed. The records certified to this court are remanded with instructions to the commission to recompute the allowance for erosion, the license-contract expenses, and the allocation of hypothetical interest to investment supplied by JDIC, in accordance with this opinion.

## Appendix A

Computation of Return to AT & T Stockholders Under Equity Leveraging as Applied by Commission

### NET

| | |
|---|---|
| Return per $1,000 of rate base at 11.48% ($1,000 x 11.48%) | $114.80 |
| Less debt cost at 8.72%, when debt is 45.6% of NET capitalization ($1,000 x .0872 x .456) | 39.76 |
| Return to AT&T on a $544 investment 1,000–456 = $544 | 75.04 |

### AT&T

| | |
|---|---|
| Return to AT&T on $544 investment | $ 75.04 |
| Less debt cost at 6.5% when debt is 12.45% of AT&T capitalization ($544 x .065 x .1245) | 4.40 |
| Less preferred stock at 7.6% when preferred stock is 3.33% of AT&T capitalization ($544 x .076 x .0333) | 1.38 |
| Equity return to AT&T stockholders on their common equity investment ($544 x 84.22% = $458.16) | 69.26 |

$$\frac{69.26}{458.16} =$$ 15.1% of return to AT&T stockholders