NARRAGANSETT ELECTRIC
COMPANY

v.

Edward F. BURKE et al.

Dennis J. ROBERTS II

v.

NARRAGANSETT ELECTRIC
COMPANY.

Nos. 82–155–M.P., 82–157–M.P.

Supreme Court of Rhode Island.

May 3, 1984.

Thomas G. Robinson, Providence, Samuel Huntington, Westborough, Mass., for petitioner.

Dennis J. Roberts II, Atty. Gen., Daniel J. Schatz, John R. McDermott, Sp. Asst. Attys. Gen., for respondent.

## OPINION

MURRAY, Justice.

This is a consolidated appeal from a decision of the Public Utilities Commission (commission) concerning a request for a rate increase filed by Narragansett Electric Company (Narragansett) on July 1, 1981.

On that date Narragansett Electric Company filed with the commission new rates designed to increase its revenues by roughly $14.4 million, or 5.2 percent. On March 30, 1982 the commission issued its initial order awarding Narragansett a rate increase of $9,506,000.

On April 7, 1982, Narragansett submitted to the commission its proposed schedule of rates. In that filing, Narragansett also directed the commission's attention to four "clerical discrepancies" in its initial order which, if revised, would reduce Narragansett's need for additional revenues by $120,000. On April 9, 1982, the commission corrected what it apparently felt were simple clerical errors in its initial order and authorized a compliance rate increase of $9,386,000.

Both Narragansett and the Attorney General of the State of Rhode Island have filed appeals from the commission's final order in docket No. 1591. Narragansett initially appealed upon three grounds, including two commission findings concerning Narragansett's calculation of its federal income tax expense.

Narragansett's grounds of appeal were originally that (1) the commission improperly computed Narragansett's interest expense deduction for federal income tax purposes, (2) the commission improperly disallowed Narragansett the recovery of certain tax expenses attributed to Narragansett's

production facilities, and (3) the commission failed to authorize a legally sufficient return on equity for Narragansett's shareholders.

On January 20, 1983, Narragansett notified this court that it was dropping its third reason of appeal upon the ground that it was moot.[1]

The Attorney General, in his capacity as legal representative of the Division of Public Utilities (the division), has also raised three issues on appeal. One of these is identical to the question posed in Narragansett's second ground of appeal—what is the amount of tax expense attributed to Narragansett's production facilities that is properly recoverable from Rhode Island customers? The other two involve the commission's calculation of Narragansett's working capital needs and its inclusion of the Providence supplemental property tax in Narragansett's rate base.[2]

Consequently, there are presently four issues pending before this court. Two were first raised by Narragansett concerning the commission's calculation of its federal income tax liability. The final two were raised by the Attorney General and involve the commission's calculation of Narragansett's working capital needs and its treatment of the Providence supplemental property tax. For purposes of convenience, our discussion will address these remaining justiciable questions in the reverse order in which they were presented on appeal.

■ The commission's final order of April 9, 1982 permitted Narragansett the right to recover an additional $261,000 in property taxes it incurred as a result of the city of Providence's supplemental tax. The division argues that such commission action was illegal since it violated the general regulatory rule prohibiting retroactive ratemaking by a public utilities commission.

See *New England Telephone and Telegraph Co. v. Public Utilities Commission*, 116 R.I. 356, 391, 358 A.2d 1, 21 (1976).

We have recently considered and rejected this same issue and argument in *Providence Gas Co. v. Burke*, No. 82–340–M.P., 475 A.2d 193 (R.I., filed February 21, 1984). The mandate of that opinion is equally applicable to this appeal and requires our affirmance of the commission's treatment of the supplemental tax.

The division next argues that the commission improperly computed Narragansett's working capital needs, resulting in an overstatement in its rate base of $10,043,000. Specifically, the division contends that Narragansett's method of computing its cash working-capital needs failed to account for its unbilled revenues earned during its lag period, the interval between the utility's rendition of service and its receipt of payment therefor. *Valley Gas Co. v. Burke*, R.I., 406 A.2d 366, 371–72 (1979).

The Division's argument is essentially the following. Expenses incurred by Narragansett in making December sales of electricity during the test year are included in Narragansett's total cost of service for the test year. Revenues earned from those December sales, however, are not included in test-year revenues at all. Narragansett defers revenue recognition for these sales until the January following the close of the test year. The result of this inclusion of December expenses and exclusion of "December" revenues increases Narragansett's cash working-capital needs above an amount properly recoverable.

In the hearings before the commission, the division proposed the adoption of a different method of accounting for Narragansett's working-capital needs which, it claims, would more accurately match Nar-

---

1. Narragansett noted in its reply brief that it had filed a new rate request with a new record subsequent to docket No. 1591 in which the commission's finding on the cost of equity would moot this ground of appeal.

2. This property tax was labeled supplemental because it was imposed in 1981 by the city of Providence to cover expenses incurred in the city's 1980 tax year.

ragansett's test-year expenses and revenues. Mr. James Rothschild, a division witness, suggested that Narragansett base its working capital computation upon a different reference point than that employed by Narragansett. Specifically, he recommended that Narragansett employ the date it books its revenues and expenses, instead of the date it renders service, to calculate working capital needs.

Mr. Rothschild's suggestion was rejected by the commission on the ground that it did not accurately reflect Narragansett's working-capital needs.

 Upon reviewing commission findings concerning the proper amount of cash working-capital required by a utility to meet its expenses during its "lag" period, our task is limited. Since determinations of cash working-capital allowances are questions of fact to be decided by the commission, *see Michaelson v. New England Telephone & Telegraph Co.*, 121 R.I. 722, 728, 404 A.2d 799, 803 (1979), "we review only to determine whether the Commission's decision is 'fairly and substantially supported by legal evidence and sufficiently specific to enable us to ascertain if the facts upon which [it is] premised afford a reasonable basis for the result reached.'" *Id.* Where the commission's findings are supported by substantial evidence, they are generally unassailable on review. *Valley Gas Co. v. Burke*, R.I., 446 A.2d 1024, 1030 (1982); *Providence Gas Co. v. Burke*, R.I., 419 A.2d 263, 268 (1980).

 In this case, the commission explicitly reviewed the two alternate methods presented to it by Narragansett and the division for calculating Narragansett's working-capital needs. In its report and order dated March 30, 1982, the commission stated that it was "not convinced that the results of the company's lead-lag study are inaccurate." The commission also found that "the Company's analysis correctly synchronizes revenue and expense

lags while the Division's adjustment distorts the Company's working capital needs by failing to measure revenue and expense lags, from the same starting point."

These findings are supported by substantial evidence and provide a specified and reasonable basis for the commission's result. *See Rhode Island Consumers' Council v. Smith*, 111 R.I. 271, 277, 302 A.2d 757, 762 (1973). The company presented two well-documented exhibits, Nos. N–21 and N–27, which plainly supported the commission's finding that Narragansett must pay for its purchased power three days before its customers pay Narragansett for the same power. This three-day lag period created a negative balance of $193,000 in Narragansett's working-capital account, which balance the commission properly accepted. Consistent with our prior holdings, the commission's findings as thus supported will not be disturbed by this court upon review.

Additionally, Narragansett's method of calculating its cash working-capital needs has been previously accepted by this court in *Narragansett Electric Co. v. Harsch*, 117 R.I. 395, 406–10, 368 A.2d 1194, 1202–03 (1977). We see no reason to depart from our holding in *Harsch* when the commission's action is totally reasonable.

Both Narragansett and the division challenge the commission's allowance of $190,000 for additional tax expense in calculating Narragansett's federal income tax liability. Such expense has arisen since Narragansett previously had taken accelerated depreciation on particular assets in calculating its federal income tax expense. The present effect of this prior acceleration has been to create an excess of book depreciation over tax depreciation upon the same assets. Consequently, Narragansett has a lower depreciation deduction for tax purposes than it does for book purposes and an additional tax expense.[3]

---

**3.** 26 U.S.C.A. § 167 (West 1978) allows the business taxpayer to deduct annually from its income an amount representing an asset's wear and tear or obsolescence for a given year. The size of such deduction depends upon the original cost of the asset and the depreciation meth-

Narragansett contends that the correct allowance for this expense amounts to $898,000 and that consequently the commission's ruling understated its federal income tax liability by $603,000. The division, however, contends that Narragansett was not entitled to any allowance for additional tax expense in 1981, and that the commission's order therefore effectively resulted in higher electric rates to the Rhode Island consumer by creating an intrastate expense that Narragansett never in fact incurred. Alternatively, both Narragansett and the division argue respectively as respondents in each other's appeal that the commission's calculation of the additional tax expense was a reasonable determination that should be sustained.

This court is all too familiar with the depreciation problem at issue in this case. In its simplest form, it involves determining which group of ratepayers, intrastate or interstate, should be forced to bear the burden of Narragansett's additional tax expense. The commission has consistently argued and held that interstate ratepayers are the proper source from which the bulk of this expense should be recouped. *See Re: Narragansett Electric Co.*, 40 P.U. R.4th 498 (1980); *Re: Narragansett Electric Co.*, 23 P.U.R.4th 516 (1978). Their position has been accepted by our court in *Narragansett Electric Co. v. Harsch*, 117 R.I. at 410–14, 368 A.2d at 1204–06, in which it was held that only that portion of additional tax expense attributable to production facilities actually providing intrastate service was properly charged to Narragansett's intrastate ratepayers. In *Harsch*, only $102,000 out of $1,069,000 (or

approximately 9.54 percent) of uncontested additional tax expense was held allocable to intrastate ratepayers. This result was reached by recognizing that $967,000 of Narragansett's additional tax expense was generated by the electric system's Providence generating plant, a plant identified by New England Power Company (Narragansett's parent) as an asset in its interstate rate base.

We see no reason to reverse this court's previous approach in this area, wherein the commission has allowed Narragansett to recover 21.20 percent of its additional tax expense from its intrastate ratepayers. This percentage accurately reflects that portion of Narragansett's additional tax expense which would have been recovered from intrastate ratepayers had the Federal Energy Regulatory Commission (FERC) agreed with the commission that such expenses were properly calculated in the interstate rate base.[4]

We do not find the decision in *NEPCO Municipal Rate Committee v. Federal Energy Regulatory Commission*, 668 F.2d 1327 (D.C.Cir., 1981) *cert. denied*, 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982), sufficiently compelling to change this result.

▮▮▮ Although there is some persuasive force in Narragansett's argument that the D.C. Circuit's *NEPCO* decision makes inequitable any allowance by the commission of less than 100 percent of its additional tax expense, that case provides no authority whatsoever to support the proposition that only FERC, and not the

---

od employed by the taxpayer. Where an accelerated method is used, relatively higher depreciation deductions will be available for the taxpayer in the early years of an asset's life than would be available for book purposes. Consequently, the use of accelerated depreciation methods by a taxpayer will result in relatively lower federal income tax expense in an asset's early years than would result if "book" methods were employed. The exact opposite trend will occur in an asset's later years. The prime use of accelerated depreciation methods will result in a relatively lower depreciation deduction for tax

purposes in an asset's later years than would be available for book purposes. Consequently, relatively greater federal income tax expense will be incurred by the taxpayer in the asset's later years.

4. In *New England Power Co.*, 18 Fed. Power Serv. (MB) 5–84 (FERC July 19, 1979), FERC refused to allow New England Power Company to recover those additional tax expenses for which the Rhode Island commission had refused recovery from the intrastate base.

commission, may regulate a utility's depreciation expenses in this area. Even though a federal agency may regulate the depreciation rates of a public utility with respect to its interstate operations, the state commission has jurisdiction over depreciation rates for the purpose of fixing intrastate rates. *Re Southern Bell Telephone and Telegraph Co.*, 66 P.U.R.3d 1, 54–59 (1966). In its regulation of intrastate rates, a state commission is not bound by the depreciation rates or methods set by its federal counterpart. *Pacific Telephone & Telegraph Company v. Public Utilities Commission*, 62 Cal.2d 634, 665–66, 401 P.2d 353, 372–73, 44 Cal.Rptr. 1, 20–21 (1965).

To accept Narragansett's argument is to embrace the position that FERC's action totally preempted the commission from regulating in this area. Imposing such a result would be tantamount to our prohibiting the commission from exercising its statutory duty to set intrastate rates. This we will not do absent a clear abuse of authority by the commission.

██ The commission carefully reviewed the unique procedural posture of this depreciation tax issue and concluded that Narragansett should recover only that percentage of additional tax expense which its ratepayers would have borne had FERC included this additional tax expense in the interstate base. Such a determination we find clearly within the commission's province of setting intrastate rates.

██ For similar reasons, we must reject the division's argument that the commission could not allow any additional depreciation expense to Narragansett when computing its tax liability. This position is inconsistent with our previous holding in *Harsch* in that it would deny Narragansett even those depreciation expenses directly attributed to production facilities providing service to intrastate customers. Addition-

ally, it disregards our well-established rule that the commission has wide discretion when separating interstate from intrastate expenses. "It [must be] recognized that this matter of making appropriate separations of properties, revenues and expenses is extremely difficult and can never be resolved with precision. Much must be left to the considered judgment of the administrator after hearing pertinent evidence on the subject." *Narragansett Electric Co. v. Kennelly*, 88 R.I. 56, 81, 143 A.2d 709, 723 (1958). Reviewing the record, we find no evidence that demonstrates that the commission's allowance of $190,000 of additional depreciation expense was arbitrary or unreasonable. Absent such a showing, its determination will not be disturbed.

The final issue to be resolved in this appeal is whether the commission's treatment of Narragansett's investment tax credit in calculating Narragansett's interest expense deduction from federal income taxes was proper. Under its method, the commission found that Narragansett would be entitled to an annual interest deduction of $7,660,000. Employing an alternate calculation, Narragansett claims that the commission's interest deduction is overstated by $908,000 and that consequently its total federal income tax expense was understated by $773,000.

The primary reason for the large discrepancy between the commission's and Narragansett's interest calculations is the disparate treatment afforded Narragansett's investment tax credit under their respective methods of calculation. In its calculation the commission includes the amount of Narragansett's investment tax credit in its rate base. This inclusion increases one multiplicand in the commission's interest-expense equation, thereby automatically increasing Narragansett's interest deduction.[5]

---

5. This result directly flows from a review of the commission's interest equation, which follows:
Total Interest Deduction =
(Weighted Cost of Debt) (Rate Base).

Obviously, inclusion of Narragansett's investment tax credit in its rate-base factor increases that factor and automatically increases the total interest deduction.

Narragansett, however, does not associate any interest expense with funds generated by its investment tax credit. Specifically, Narragansett argues that there are no debt costs associated with investment tax credit funds, that such credits are financed neither by debt nor by equity, but are simply generated by tax benefits provided under the Internal Revenue Code. Narragansett would thus calculate its annual interest deduction in a manner virtually identical to the commission's except in one respect—it would completely exclude from its rate base any amounts representing funds supplied by investment tax credits. The result of this exclusion is plain; the same multiplicand representing rate base employed in the commission's interest equation must be reduced by the total investment tax credit amounts available in Narragansett's interest equation.[6]

The resultant deduction is therefore reduced by a multiple of Narragansett's cost of debt. Narragansett contends that this figure, based upon actual interest expenses incurred, is binding upon the commission.

■ At the outset, we note that the treatment to be given a tax credit by a public utility is a matter within the discretion of the Public Utilities Commission. *Rhode Island Consumers' Council v. Smith*, 113 R.I. 384, 391, 322 A.2d 17, 21 (1974). Unless such treatment is arbitrary or unreasonable, the commission's determination is final.

■ In the instant case, the commission determined that the division's method was "best suited to synchronizing the Company's rate of return, operating expenses, and revenue level." The commission's rationale for this finding is enlightening: "To the extent that this method attributes an interest deduction to the investment tax credit, we believe this result is justified by the return realized by the Company in that portion of its rate base financed by the investment tax credit."

The commission's rationale is quite reasonable. Its method divides the financial benefits created by the investment tax credit between Narragansett and its ratepayers. Narragansett is permitted to earn a return upon that amount of its rate base financed by its investment tax credits, but its customers receive a corresponding reduction in their electric rates based upon Narragansett's reduced federal tax expenses.[7]

This treatment comports with the congressional philosophy underlying 26 U.S.C.A. § 46 (West 1983) that the benefits of the investment tax credit be shared by consumers and utility investors. *See NEPCO Municipal Rate Committee v. Federal Energy Regulatory Commission*, 668 F.2d at 1337–38;[8] *Union Electric Co. v. Feder-*

---

6. To continue the analysis of the previous footnote:
 Total interest Deduction =
 (Weighted Cost of Debt) (Rate Base—Investment Tax Credit "Funds").

7. To see this result, remember that investment tax credit "funds" cost Narragansett nothing. They are not borrowed from a lender or supplied by the utility's shareholders. Since Narragansett earns a return upon them, however, the commission's treatment effectively increases Narragansett's income despite the fact that the utility bore *no corresponding cost in "acquiring"* these "funds." Thus, the commission's allowance of any return on this increment of rate base represents a real economic gain to Narragansett and a reciprocal loss to its ratepayers who must pay higher electric rates.
 To offset this result, the commission has created a corresponding loss to Narragansett and

gain to its ratepayers. For tax purposes, Narragansett is treated as having actually incurred interest expense in "acquiring" its investment tax credit "funds." Therefore, its federal income tax expense is reduced, effectively lowering the electric rate by a specific increment representing its lower tax expense.
 Without this offset, the Attorney General's argument that the utility seeks to have it "both ways" is accurate—Narragansett would have the benefit of increased returns without a reduction for lower federal income tax liability.

8. In the discussion of the investment tax credit treatment at issue here, the D.C. Circuit Court of Appeals noted that the 1979 amendment of Treas.Reg. § 1.46–6(b)(3)(ii) specifically provides for a sharing of tax credit benefits among utilities and investors. "The introduction appearing in the Federal Register in relation to the

al *Energy Regulatory Commission,* 668 F.2d 389, 395 (8th Cir.1981); *Public Service Company of New Mexico v. Federal Energy Regulatory Commission,* 653 F.2d 681 (D.C.Cir.1981). It reflects an equitable resolution of a highly technical accounting problem in an area in which the commission, and not this court, has the requisite expertise.

During its oral argument, Narragansett argued that our recent decision in *New England Telephone & Telegraph Co. v. Public Utilities Commission,* R.I., 459 A.2d 1381 (1983), requires our rejection of the commission's use of the "hypothetical interest" deduction. From our reading of that case, we can find no such constraint. Our rejection of the hypothetical-interest method employed in *New England Telephone* was not based upon our affinity for one particular method of accounting for a utility's interest expense over another, but rather upon the fact that there was "no competent legal evidence to support the assignment of a hypothetical rate of interest" to the tax-credit amount. *Id.* 459 A.2d at 1385. In this case, there is ample evidence to support the commission's hypothetical-interest calculation for Narragansett's investment tax credit "funds." The division demonstrated and the commission found that a failure to impute interest expense upon these "funds" to Narragansett would result in financial gain for Narragansett without any corresponding benefit for its ratepayers. The commission's action balanced this result by reducing Narragansett's federal income tax expense. Such a course was well within its discretion to determine the proper treatment to be afforded a particular tax credit, *Rhode Is-*

land *Consumers' Council v. Smith,* 113 R.I. at 391, 322 A.2d at 21, and represented a reasonable response to a complex accounting debate.

Narragansett finally argues that the commission's treatment of investment tax credits in a prior rate proceeding precludes its approach here. *See Narragansett Electric Company,* 40 P.U.R.4th 498, 516–17 (1980). Such an argument is wholly without merit. It ignores our basic rule that the commission is not bound to employ one particular method utilized in a prior proceeding when ruling upon the rate request currently before it. *United States v. Public Utilities Commission,* 120 R.I. 959, 966–67, 393 A.2d 1092, 1096 (1978); *Narragansett Electric Co. v. Kennelly,* 88 R.I. at 72–73, 143 A.2d at 719. As long as the commission's end result is fair and reasonable, this court will not normally interfere with its methodology. *Michaelson v. New England Telephone & Telegraph Co.,* 121 R.I. at 728, 404 A.2d at 804. As our previous discussion indicates, Narragansett has failed to convince us that the commission acted unreasonably or unfairly in its treatment of the utility's investment tax credits. Consequently, the commission's methodology will not be revised upon review.

We have considered all other arguments of Narragansett and the division and consider them to be without merit. Both petitions for certiorari are denied, and the record is remanded to the commission for further proceedings consistent with this opinion.

---

1979 amendment of regulation § 1.46–6(b)(3)(ii) states:

'The Committee reports also state that the limitations of section 46(f) were intended to achieve two goals: a sharing of benefits between consumers and investors and a limitation on Federal Revenue losses. Under certain circumstances, the common shareholder equity rule [granting ADITC the return on common equity] would deny consumers any of the benefits of a credit and could force ratemaking authorities to set rates higher

than the rates that would have been established had no credit been available. Under such circumstances, Federal revenue losses would not be merely limited to the amount of the credit, but would be reduced to an amount less than the credit. Congress did not intend to force consumers to subsidize the cost of the investment tax credit.' 44 Fed.Reg. 17666, 17667 (1979)." *NEPCO Municipal Rate Committee v. Federal Energy Regulatory Commission,* 668 F.2d 1327, 1337 (D.C.Cir.1981).

Justice WEISBERGER, with whom Justice KELLEHER joins, dissenting in part and concurring in part.

Although I am in general agreement with the opinion of the majority, I am constrained to point out my disagreement with one aspect of the opinion.

In this case the commission imputed a hypothetical rate of interest to tax credits given the company pursuant to provisions of the Internal Revenue Code. These tax credits are generated by investments made by the company in capital equipment and were designed by Congress as a means of stimulating investment and employment. In considering the propriety of imputing a similar hypothetical rate of interest to job-development investment credits in the case of *New England Telephone & Telegraph Co. v. Public Utilities Commission*, R.I., 459 A.2d 1381 (1983), we determined both that such an action might imperil the continuing availability of such credits and that no competent legal evidence existed to support the assignment of a hypothetical rate of interest to such funds that are concededly supplied interest free. *Id.*, 459 A.2d at 1385. The majority takes the position that there is evidence in the instant case to support such a determination.

It should be recognized that the legislative history of 26 U.S.C.A. § 46(f) (West 1983) reflects the principle that regulatory agencies should not defeat the tax credits' intended purpose by requiring a utility to pass through to ratepayers the savings resulting from the credit. *See H.Rep. No. 533, 92d Cong., 1st Sess., reprinted in* 1971 U.S. Code Cong. & Ad. News 1825, 1839. The investment tax credit operates to reduce federal income taxes by allowing credits for amounts that a utility invests in new plant and equipment. For those investments, the utility takes a credit known as an Accumulated Deferred Investment Tax Credit (ADITC), the amount of which is measured by a statutory percentage of the investment in new qualifying facilities during the tax year. As previously indicated, the objective of the credit is to stimulate utility companies' investment in new plants and equipment, thereby increasing employment, productivity, and general economic activity. *See NEPCO Municipal Rate Committee v. Federal Energy Regulatory Commission*, 668 F.2d 1327, 1335 (D.C.Cir.1981).

Section 46(f)(2) disallows the credit under the following circumstances:

"(A) Cost of service reduction.—If the taxpayer's cost of service for ratemaking purposes or in its regulated books of account is reduced by more than a ratable portion of the credit allowable by section 38 (determined without regard to this subsection), or

"(B) Rate base reduction.—If the base to which the taxpayer's rate of return for ratemaking purposes is applied is reduced by reason of any portion of the credit allowable by section 38 (determined without regard to this subsection)."

In addition to the statute, the Internal Revenue Service has issued regulations in implementation of § 46(f). This regulation attempts to explain in more detail that which constitutes a reduction of rate base and consequently may cause the credit to be disallowed. The pertinent regulation, Treas.Reg. § 1.46–6(b)(3)(ii) (1979), states:

"(ii) In determining whether, or to what extent, a credit has been used to reduce rate base, reference shall be made to any accounting treatment that affects rate base. In addition, in those cases in which the rate of return is based on the taxpayer's cost of capital, reference shall be made to any accounting treatment that affects the permitted return on investment *by treating the credit in any way other than as though it were capital supplied by common shareholders* to which a 'cost of capital' rate is assigned that is not less than the taxpayer's overall cost of capital rate (determined without regard to the credit)." (Emphasis added.)

That regulation has been rather uniformly interpreted to require that these unamor-

tized credits be included in the rate base for purposes of calculating a rate of return and that the regulatory agency must apply a rate of return to such credit not less than the overall rate of return assigned to the rate base. *See Public Service Co. of New Mexico v. Federal Energy Regulatory Commission*, 653 F.2d 681, 687–88 (D.C. Cir.1981).

After oral argument had been completed in the instant case, the Attorney General cited to us a number of cases in which a federal court had allowed a hypothetical rate of interest to be applied to investment tax credits for the purpose of reducing the allowable income tax deduction accorded to the utility. This results in diminishing the company's allowed expenses and, consequently, diminishing its revenue requirements. This process is rationalized by suggesting that this result causes a sharing of the tax credit advantage between the utility and the ratepayers. *See, e.g., NEPCO Municipal Rate Committee v. Federal Energy Regulatory Commission*, 668 F.2d at 1377–38; *Union Electric Co. v. Federal Energy Regulatory Commission*, 668 F.2d 389, 393–95 (8th Cir.1981). The Supreme Judicial Court of Maine has followed this hypothetical imputation of interest in *New England Telephone & Telegraph Co. v. Public Utilities Commission*, 448 A.2d 272, 304–09 (Me.1982). The Court of Appeals of North Carolina has strongly disagreed with this position in *State Utilities Commission v. Carolina Telephone & Telegraph Co.*, 61 N.C.App. 42, 300 S.E.2d 395 (1983). The North Carolina Court of Appeals suggests that the interpretation of the federal courts ignores the requirement of the IRS regulation that no accounting treatment should be given to such credits in any way other than as though they were " 'capital supplied by common shareholders.' " *Id.*, 300 S.E.2d at 400–01. Viewing these credits as capital supplied by common shareholders would, of course, preclude an assignment to such capital of a hypothetical interest rate as though it constituted borrowed funds. Although I believe that the North Carolina Court of Ap-

peals has given a well-reasoned opinion in the interpretation of Treas.Reg. § 1.46–6(b)(3)(ii), I cannot fault the majority for being persuaded that interpretations by federal courts of appeal of United States Treasury Regulations are entitled to great weight.

My examination of the evidence in this case does not enlighten me concerning the "ratable" sharing of the tax credits by the utility and the ratepayers save by virtue of the most general intuitive assertions. The principal witness who testified on behalf of the division in favor of ascribing hypothetical interest to ADITC was James A. Rothschild. When asked for his rationale to persuade the commission to depart from its prior decision on this precise issue in docket No. 1499, the witness did no more than quote from the opinion of the Circuit Court of Appeals for the District of Columbia in *NEPCO Municipal Rate Committee v. Federal Energy Regulatory Commission, supra.* Indeed, he included in his quotation the nub of that court's opinion:

"FERC assumes that the company would, absent the credit, have acquired financing by using a combination of debt and equity in the same proportion they bear in present capitalization (less tax credit funds). That assumption creates an 'alternative utility' that might have evolved in the absence of tax credit funds. *The capital structure so created is speculative but permissible*, in view of the impossibility of determining exactly what financing, and consequent interest payment, the utility might have arranged absent the investment tax credit." 688 F.2d at 1337–38. (Emphasis added.)

I am constrained to conclude that speculative assumptions, whether those of the witness or those of another agency, do not constitute competent evidence. I am of the opinion that both the FERC and the local regulatory agency in adopting this posture are essentially diluting the thrust of the congressional intent in providing these credits in the first instance. The sounder

policy would be to allow the utility the deduction for its actual apportioned income tax liability. The most rational way to reach this determination is to allow the utility to deduct the interest that it actually pays rather than to create speculative hypotheses.

In light of the fact that we made a definite determination on this issue in *New England Telephone & Telegraph Co. v. Public Utilities Commission*, R.I., 459 A.2d 1381 (1983), less than a year ago, and further in light of the fact that the commission itself took a similar position in respect to this very utility in docket No. 1499 (even though it may not be bound thereby), and further in light of the speculative assumptions upon which this hypothetical structure is purportedly based, I suggest that consistency demands that the Commission be precluded from overstating the company's interest deduction by $908,000, and thereby understating its actual federal income tax expense by $773,000. I would return to the rudimentary principal enunciated in *Rhode Island Consumers' Council v. Smith*, 113 R.I. 384, 396, 322 A.2d 17, 23–24 (1974), that a utility should be allowed to deduct only those taxes that it actually pays, and I suggest that the converse is equally true that a utility should be allowed to deduct its actual taxes rather than a lesser hypothetical sum.

For the reasons given, I respectfully dissent from this portion of the majority opinion.